SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-06-0240-AP |
| Appellee, | ) |
| | ) Yuma County |
| v. | ) Superior Court |
| | ) Nos. SC89C15444 |
| ALVIE COPELAND KILES, | ) and SC89C15577 |
| | ) |
| Appellant. | ) |
| _____ | ) **O P I N I O N** |

Appeal from the Superior Court in Yuma & Maricopa Counties
The Honorable Kirby D. Kongable, Judge Pro Tempore[1]

**AFFIRMED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
     By   Kent E. Cattani, Chief Counsel,
          Criminal Appeals/Capital Litigation
          Amy Pignatella Cain,                             Tucson
          Assistant Attorney General
Attorneys for State of Arizona

LAW OFFICES OF PAUL J. MATTERN                             Phoenix
     By   Paul J. Mattern
Attorney for Alvie Copeland Kiles
_____

**R Y A N**, Justice

**I**
**A**

¶1        In February 1989, Valerie Gunnell, and her five-year-old and nine-month-old daughters were beaten to death in their

---

[1]     Judge Kongable presided over this case first as a superior court judge in Yuma County, and later, after he had left the bench in Yuma County, as a judge pro tempore in Maricopa County.

1

Yuma apartment. After a jury convicted Alvie Kiles of three counts of first degree murder and two counts of child abuse, the trial judge sentenced Kiles to death for each murder. The convictions and Kiles' sentences were affirmed on direct appeal. *See State v. Kiles* (*Kiles I*), 175 Ariz. 358, 857 P.2d 1212 (1993). In post-conviction relief proceedings, the superior court found ineffective assistance of counsel and vacated the convictions and sentences.

**¶2** After a second jury trial in 2000, Kiles was again convicted of three counts of first degree murder and two counts of child abuse. The parties later stipulated to transfer the case to Maricopa County. In 2006, a jury[2] found three aggravating factors for each murder: (1) Kiles had been previously convicted of a crime involving the use or threat of violence, (2) he had been convicted of multiple homicides, and (3) he had committed the offenses in an especially cruel, heinous, or depraved manner. *See* Ariz. Rev. Stat. ("A.R.S.") § 13-703(F)(2) (1989) (prior offense involving threat or use of violence); A.R.S § 13-751(F)(6), (F)(8) (Supp. 2008) (multiple

---

[2] After *Ring v. Arizona,* 536 U.S. 584 (2002), legislation was enacted providing for a jury trial as to both the existence of capital aggravating circumstances and the appropriate sentence. 2002 Ariz. Sess. Laws, ch. 1, § 3 (5th Spec. Sess.); *see State v. Ring,* 204 Ariz. 534, 545, ¶ 13, 65 P.3d 915, 926 (2003).

murders and especially cruel, heinous or depraved).[3] The jury also concluded that the two children were less than fifteen years of age. A.R.S. § 13-751(F)(9) (defendant an adult and victim younger than fifteen). The jurors, however, returned a verdict of death only for the murder of Valerie Gunnell.[4]

¶3 An automatic notice of appeal was filed under Arizona Rules of Criminal Procedure 26.15 and 31.2(b) and A.R.S. §§ 13-4031 and -4033 (2001). This Court has jurisdiction under the Arizona Constitution, Article 6, Section 5(3), and A.R.S. §§ 13-4031, -4033.

# B[5]

¶4 Alvie Kiles moved in with Valerie Gunnell and her two daughters in January 1989. Valerie and Kiles soon began arguing about Kiles stealing her food stamps to support his cocaine habit. On February 9, 1989, Deirdre Johnson, who lived next

---

[3] Arizona's capital sentencing statutes were reorganized and renumbered to A.R.S. §§ 13-751 to -759. 2008 Ariz. Sess. Laws, ch. 301, §§ 26, 38-41 (2d Reg. Sess.). Because the renumbered statutes are not materially different, we cite the current version of the statute, unless otherwise noted.

[4] The jurors could not reach a unanimous verdict regarding the imposition of a capital sentence for the murders of the children. The State dismissed the notice of death penalty regarding those two slayings and the superior court sentenced Kiles to consecutive life sentences. Kiles does not appeal these convictions or sentences.

[5] We view the facts in the "light most favorable to sustaining the [guilty] verdict." *State v. Tucker* (*Tucker I*), 205 Ariz. 157, 160 n.1, 68 P.3d 110, 113 n.1 (2003).

door to Valerie, saw Kiles outside the apartment working on his car. Early the next day, Johnson saw Kiles back his car into a parking space at the apartment. Later that morning Valerie's mother knocked on the door of the apartment, but got no answer.

¶5 Larry Hawkins saw Kiles outside Hawkins' apartment that morning in Valerie's car. Valerie's step-father also saw Kiles driving her car that day. Later, Deirdre Johnson noticed Kiles struggling to lift a trash bag over the fence behind the apartment. He dropped the bag, which emitted a "loud thud sound" when it landed.

¶6 That afternoon, Kale Johnson saw Kiles sitting in Valerie's car at a Yuma park. Referring to Valerie, Kiles told Johnson, "I killed that girl." Kiles admitted to Johnson that "I killed the kids too" because they were "crying and hollering and screaming." He told Johnson that he had used something he took from the car to commit the murders. Kiles also told Johnson that he had disposed of the children's bodies in the Colorado River.

¶7 Johnson did not believe Kiles, so Kiles took Johnson to Valerie's apartment. Johnson saw Valerie's body lying on the floor. There was a puddle of blood on the floor and blood "all over the walls and the ceilings." Johnson attempted to leave the apartment, but Kiles hit him with a broom handle.

¶8 Kiles admitted killing Valerie and the children to

others.  Kiles told Larry Hawkins that he had killed Valerie and her children.  He explained that he and Valerie had argued over food stamps that Kiles had taken to buy cocaine.  Kiles told Hawkins that Valerie had slapped him twice, once after he had told her not to.  Kiles then went to his car and retrieved a tire jack, which he used to strike Valerie at least twice.  Hawkins stated that Kiles told him that Valerie "regained consciousness" after the initial blow and asked Kiles, "[W]hy did [you] do this?"  Kiles told Hawkins that he had killed the children "because . . . they had seen him."  Hawkins wrote a letter to Yuma Silent Witness describing Kiles' admissions.

¶9        Kiles also admitted to Jesse Solomon, a family friend, and to his mother, Imojean Kiles, that he had killed Valerie with the jack.  He further told his mother that he had "taken care of" the children "because they could talk," and had "dumped" the children's bodies in a canal.

¶10       The Yuma police went to Valerie's apartment on February 11, 1989.  The police found the apartment in "disarray," with cartons of eggs on the floor and a lamp overturned.  An officer saw blood spatters in a bedroom, signs of a struggle, blood on the bed, and something "wrapped up in a blanket" in the hall.  It was Valerie's body.

¶11       Further investigation at the apartment revealed blood smeared on the bathroom floor "as if somebody had tried to wipe

5

[it up]." The bathroom smelled of cleanser and police found a pile of bloody towels.

¶12     In Valerie's bedroom, the bed was covered in papers and money and there was clothing all over the floor. A blood-soaked pillow and a piece of a car jack with her hair and blood on it were also found. In the children's bedroom, two "very large pools of blood" were found on the bed. Blood spatter was found on the walls, drapes, ceiling, and door of the west bedroom. A blood spatter expert testified that at least fourteen blows were delivered in the children's room. In the northwest corner of the living room, a blood-stained ottoman and a bone fragment were also found. Blood had soaked into the carpeting. Blood spatter and blood stains were found in the living room. A chair in the living room had stains that indicated someone had lost a lot of blood. A large bone fragment and blood spatter were found near the south wall. In addition, blood smears were found on the front door of the apartment. Blood spatter and smears were found in the kitchen-dining area as well.

¶13     Valerie died from multiple blunt force trauma to the head with multiple scalp lacerations, skull fractures, and a brain laceration. She had a broken arm, which medical testimony identified as a defensive wound. The body of Valerie's younger child was later found in a canal in Mexico. She died of blunt

force trauma to the skull with extensive skull fractures and a brain laceration. The older child was never found. Her blood, however, was detected on the mattress cover in the apartment.

¶14    In his 2000 guilt-phase trial, Kiles admitted murdering Valerie.[6]

## II

### A

¶15    Kiles first argues that the trial court's instruction on premeditation, combined with the prosecutor's arguments, ran afoul of this Court's ruling in *State v. Thompson*, 204 Ariz. 471, 479-80, ¶¶ 32-34, 65 P.3d 420, 428-29 (2003).

¶16    Because Kiles failed to object to either the jury instruction or the prosecutor's argument, we review only for fundamental error. *See State v. Gallegos*, 178 Ariz. 1, 11, 870 P.2d 1097, 1107 (1994) ("Failure to object at trial to an error or omission . . . waives the issue on appeal unless the error amounts to fundamental error."); *see also* Ariz. R. Crim. P. 21.3(c). Fundamental error is "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial." *State v. Henderson*, 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2005)

---

[6]    Kiles did not testify at the first trial. *See Kiles I*, 175 Ariz. at 363, 857 P.2d at 1217.

7

(internal quotation marks omitted). "To prevail under this standard of review, a defendant must establish both that fundamental error exists and that the error in his case caused him prejudice." *Id.* at ¶ 20.

**1**

**¶17** First degree murder is committed when a person "[i]ntending or knowing that his conduct will cause death . . . causes the death of another with premeditation." A.R.S. § 13-1105(A)(1) (1989). The superior court gave the following instruction about premediation:

> Premeditation means the defendant acts with the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.

**¶18** No error occurred here. *Thompson* invalidated the use of an instruction stating both that premeditation could be "as instantaneous as successive thoughts of the mind" and that "proof of actual reflection is not required." 204 Ariz. at 479-80, ¶¶ 32-34, 65 P.3d at 428-29. The jury instruction given here is similar to the alternative instruction approved in *Thompson*, and reflects the statute in force at the time. *Id.* at 479, ¶ 32, 65 P.3d at 428.[7] As Kiles acknowledges, the

---

[7] The statute defined premeditation as meaning that

8

instruction neither included the disapproved "instantaneous as successive thoughts" language nor stated that actual reflection was not required. Indeed, the instruction specifically stated that premeditation required consideration of the murder preceding the act.

¶19 This instruction correctly distinguishes between reflection and action. *See id.* ("[The jury must find that the defendant] reflected on the decision before killing. It is this reflection, regardless of the length of time in which it occurs, that distinguishes first degree murder from second degree murder.").

¶20 This distinction is crucial because it was the language stating "that the length of time [for reflection] can be 'as instantaneous as successive thoughts of the mind'" that created the problem in *Thompson*. *Id*. at 478, ¶ 26, 65 P.3d at 427. This problem was obviated by the trial court's instruction here, consistent with *Thompson*, specifying that an act that is the "instant effect of a sudden quarrel or heat of passion" is not premeditated. *Id*. at ¶ 28. "This language distinguishes

---

the defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.

A.R.S. § 13-1101(1) (1989).

impulsive killings from planned or deliberated killings and confirms the legislature's intent that premeditation be more than just a snap decision made in the heat of passion." *Id.*

**2**

¶21     Nor did the prosecutor's argument create fundamental error. The State's theory of the case was that Kiles left Valerie's apartment, went to his car, returned with the jack, attacked her, and when she regained consciousness, began the final, fatal onslaught. With respect to premeditation, although the prosecutor noted that the time required to actually premeditate could be "instantaneous," he made clear that such was not the case in this matter. His argument focused on the circumstantial evidence of premeditation, noting that Kiles had to go out to his car, open the hatchback, find a weapon, return to the apartment, and then attack Valerie. Further, after his first attack did not kill Valerie, Kiles resumed his assault.

¶22     The prosecutor's argument was consistent with *Thompson*, which approved an instruction that said reflection can occur "regardless of the length of time in which it occurs" and specifically permits prosecutors to argue circumstantial evidence of reflection. 204 Ariz. at 479, ¶¶ 31-32, 65 P.3d at 428 ("Such evidence might include, among other things, threats made by the defendant to the victim, a pattern of escalating violence between the defendant and the victim, or the

10

acquisition of a weapon by the defendant before the killing.").[8]

**B**

¶23     The State charged Kiles with murdering Valerie Gunnell knowingly and with premeditation. *See* A.R.S. § 13-1105(1) (1989).[9]  During closing arguments, the prosecutor and Kiles' attorney argued about whether the jury could consider intoxication in determining premeditation.

¶24     The prosecutor argued that "intoxication does not apply when you consider first degree murder.  That is all there is to it.  No argument could be made that it's any different. When you are discussing . . . the crime of first degree murder, whether it be premeditated or whether it be felony murder, you are not allowed to consider that the defendant may have been drinking or may have been intoxicated.  That's the law."  On rebuttal, the prosecutor similarly argued that intoxication was not a consideration in determining whether first degree murder had been committed, particularly noting that intoxication does

---

[8]     In his reply brief, Kiles attempted to add new arguments relating to prosecutorial misconduct.  These arguments, however, are waived, because "opening briefs must present significant arguments, supported by authority, setting forth an appellant's position on the issues raised." *State v. Carver*, 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989).

[9]     This Court has held that A.R.S. § 13-1105 permits a defendant to be charged with either knowing or intentional murder, and that knowing alone could be charged "[e]ven if the State charged knowingly rather than intentionally to preclude the introduction of evidence of defendant's intoxication." *State v. Lavers*, 168 Ariz. 376, 389, 814 P.2d 333, 346 (1991).

11

not apply to a "knowing" crime.

¶25     In contrast, the defense argued that Kiles' intoxication affected his ability to "premeditate and commit that murder." Kiles' attorney continued, "You can consider the intoxication. We would not have put them in those instructions if we didn't want you to consider it . . . . As I told you in opening, this is a case about the degree to which you have to hold Alvie Kiles responsible for the death of Valerie."

¶26     Kiles also asked the court for a curative instruction on premeditation in light of the prosecutor's argument. The trial court concluded that the following instruction on intoxication sufficed:

> "Intoxication" means any mental or physical incapacity resulting from use of drugs or intoxicating liquors. No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition, but when the actual existence of the culpable mental state of intentionally or with the intent to is a necessary element to constitute any particular species or degree of offense, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the culpable mental state with which he committed the act.

¶27     "A trial court's refusal to give a jury instruction is reviewed for abuse of discretion." *State v. Anderson* (*Anderson II*), 210 Ariz. 327, 343, ¶ 60, 111 P.3d 369, 385 (2005). The Court reviews de novo whether a jury instruction accurately reflects the law. *State v. Cox*, 217 Ariz. 353, 356, ¶ 15, 174

12

P.3d 265, 268 (2007).

¶28       Kiles' claim that he was entitled to an instruction on his "defense" of intoxication is without merit.  The trial court instructed the jury under the terms of former A.R.S. § 13-503 (1989).[10]  That section provided that

> [n]o act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition, but when the actual existence of the culpable mental state of intentionally or with the intent to is a necessary element to constitute any particular species or degree of offense, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the culpable mental state with which he committed the act.

¶29       The statute unambiguously provides that intoxication is a defense only against the culpable mental state of intentionally.  *See Lavers*, 168 Ariz. at 389, 814 P.2d at 346 (concluding that voluntary intoxication is no defense to knowing first degree murder).  Consequently, Kiles' argument that he may not have reflected on his decision to bludgeon Valerie because he was voluntarily intoxicated cannot be sustained.

¶30       Kiles also argues that this Court's holdings in *State v. Moody* (*Moody II*), 208 Ariz. 424, 466-67, ¶¶ 188-96, 94 P.3d 1119, 1161-62 (2004), and *State v. Schurz*, 176 Ariz. 46, 55 &

---

[10]    The legislature amended the statute in 1994 to eliminate intoxication as a defense "for any criminal act or requisite state of mind."  A.R.S. § 13-503 (2001); 1993 Ariz. Sess. Laws, ch. 256, §§ 2, 3 (1st Reg. Sess.).

13

n.5, 859 P.2d 156, 165 & n.5 (1993), indicate that intoxication under § 13-503 is a defense to premeditation. These cases do not so hold. Rather, consistent with the statute, they hold that intoxication is relevant to the culpable mental state of intentional.

¶31 For instance, in *Moody II*, we observed that the trial court erred because "[r]ather than instructing the jury that intoxication could be considered in determining Moody's *mental state* at the time of the acts, the trial court instructed the jury on the later version of the statute, which disallows intoxication as a defense." 208 Ariz. at 466, ¶ 188, 94 P.3d at 1161 (emphasis added). In *Schurz*, we explained that § 13-503 permitted a jury to consider voluntary intoxication only when the culpable mental state is intentional or with intent to. 176 Ariz. at 55, 859 P.2d at 165.

¶32 *Schurz* addressed whether an intoxication instruction was appropriate when a defendant was charged with "intentionally" or "knowingly" committing first degree murder. *Id*. at 55, 859 P.2d at 165. The Court explained that "[a]s a matter of logic and statutory construction, an allegation of 'intending or knowing' is indistinguishable from an allegation of 'knowing.'" *Id*. "An inexorable result of the statute, then, is that voluntary intoxication under A.R.S. § 13-503 will be considered by the jury only when intent is alleged and knowing

14

is not alleged." *Id.* The same reasoning applies to the premeditation instruction given in this case.

¶33    *Schurz* left open whether "intoxication could be relevant and admissible on the question of reflection [as a requirement of premeditation], even if not admissible on the question of culpable mental state." *Id*. at 55 n.5, 859 P.2d at 165 n.5. But the premeditation instruction given here required proof that Kiles acted "with the *knowledge* that he will kill another human being when such *intention* or *knowledge* precedes the killing by a length of time to permit reflection." (Emphasis added.) Because the instruction referred to both the knowledge and intentional mental states, there was no error.

C

¶34    Although Kiles has affirmatively waived any challenge to the guilt and sentencing for the deaths of the two children, he nevertheless argues that the admission of various photographs, both at the guilt trial and during the sentencing proceedings, was error.

¶35    Admission of such evidence is reviewed for abuse of discretion. *State v. Spreitz* (*Spreitz I*), 190 Ariz. 129, 141, 945 P.2d 1260, 1272 (1997). "The admissibility of a potentially inflammatory photograph is determined by examining (1) the relevance of the photograph, (2) its tendency to incite or inflame the jury, and (3) the probative value versus potential

15

to cause unfair prejudice." *State v. Cruz*, 218 Ariz. 149, 168-69, ¶ 125, 181 P.3d 196, 215-16 (2008)(internal quotation marks omitted).

¶**36** Kiles' opening brief does not specify his objection to any but two of the challenged photographs. He has therefore waived any argument as to the other photographs. *See State v. Martinez*, 218 Ariz. 421, 434 n.14, ¶ 59, 189 P.3d 348, 361 n.14 (2008) (waiver found when argument fails to identify basis).

¶**37** Exhibit 70, one of two exhibits on which Kiles presented argument, plainly meets the test for admissibility. The photograph demonstrates Valerie's broken arm, which medical testimony explained was a defensive wound. "[T]he fact and cause of death are always relevant in a murder prosecution." *Cruz*, 218 Ariz. at 169, ¶ 126, 181 P.3d at 216 (internal quotation marks omitted). Kiles has identified nothing about the photograph that is particularly inflammatory, especially given that "[t]here is nothing sanitary about murder." *Id.* at ¶ 127 (internal quotation marks omitted). Finally, the defensive wounds portrayed in the photograph are highly probative; the photograph thus corroborated that Kiles committed first degree murder and supported the existence of the aggravating factor of cruelty. *See* A.R.S. § 13-751(F)(6).

¶**38** With respect to Exhibit 72, a photograph of one of the

children,[11] Kiles suffered no prejudice.  Given that the jury did not determine that a sentence of death was appropriate for the slayings of the children, we cannot conclude that this photograph prejudiced the jury with regard to the verdict rendered for Valerie's murder.

D

¶39    Kiles claims that he was denied representation of counsel in violation of the Sixth Amendment.  In briefing and in oral argument, Kiles' appellate counsel contends that cumulative evidence of alleged ineffectiveness and delays in the appointment of counsel constitute complete deprivation of counsel for Sixth Amendment purposes, obviating any need for him to establish prejudice.  *See Powell v. Alabama*, 287 U.S. 45, 68-73 (1932) (holding that due process requires the provision of counsel).

¶40    Kiles does not claim that he was without counsel in any proceeding critical to his defense or that counsel lacked ample time to prepare.  *State v. Glassel*, 211 Ariz. 33, 51, ¶¶ 62-64, 116 P.3d 1193, 1211 (2005) (rejecting claim of per se ineffective assistance when defense counsel presented arguments and evidence, but no witnesses, in mitigation); *see also Powell*, 287 U.S. at 71 (holding due process requires courts to assign

---

[11]    This photograph depicts the child's body after it was recovered from a canal in Mexico a week after the murders.

counsel to capital defendants in a manner that does not "preclude the giving of effective aid in the preparation and trial of the case"). Nor does Kiles contend on appeal he had an irreconcilable conflict with counsel. *See State v. Moody* (*Moody I*), 192 Ariz. 505, 508-09, ¶¶ 21, 23, 968 P.2d 578, 581-82 (1998) (reversing conviction and sentence when record demonstrated irreconcilable conflict).

¶41     Kiles recognizes that ineffective assistance of counsel claims are properly brought in post-conviction proceedings under Arizona Rule of Criminal Procedure 32. *E.g.*, *State v. Spreitz* (*Spreitz II*), 202 Ariz. 1, 3, ¶ 9, 39 P.3d 525, 527 (2002). Indeed, his counsel conceded at oral argument that all of his claims could be brought in such a proceeding. But he nonetheless claims that his numerous allegations of ineffectiveness may be combined to create structural error and should be considered on direct appeal. *See United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984) ("The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding.").

¶42     Even accepting all of Kiles' allegations as true,[12] we

_____

[12]    The State challenges the accuracy of Kiles' characterization of the record below. Because we do not address his claims of ineffective assistance, we express no opinion on the allegations or their veracity and leave them for Kiles to

18

cannot conclude that he was effectively deprived of counsel. The most that can be said is that there were delays and allegations of poor professional conduct.

¶43	Because we cannot consider facts outside the record, our consideration of ineffective assistance of counsel claims on direct appeal would rarely result in reversal.  We caution that raising an argument such as this on direct appeal gains very little, but risks a great deal, as the defendant who asks this Court to determine issues of ineffectiveness on the appellate record faces the possibility of later preclusion.  *See* Ariz. R. Crim. P. 32.2(a)(2) ("A defendant shall be precluded from relief under this rule based upon any ground . . . [f]inally adjudicated on the merits on appeal or in any previous collateral proceeding . . . ."); *see also Spreitz II*, 202 Ariz. at 3, ¶ 9, 39 P.3d at 527 (explaining that improvidently raised ineffective assistance claims are not precluded because appellate courts will decline to address such claims).

¶44	Nonetheless, Kiles attempts to distinguish his case by arguing that the record demonstrates several violations of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003) ("ABA Capital Standards"), the ABA Criminal Justice Defense Function Standards

---

raise in a proper proceeding.  *See Glassel*, 211 Ariz. at 51 n.9, ¶ 64, 116 P.3d at 1211 n.9.

19

(3d ed. 1993) ("ABA Criminal Standards"), and the Arizona Rules of Professional Conduct. Specifically, he alleges that his attorneys failed to properly assemble a defense team, investigate the underlying facts of the case, communicate with Kiles, and represent him competently and diligently. *See, e.g.*, Ariz. R. Sup. Ct. 42, E.R. 1.1, 1.3 (competence and diligence); ABA Capital Standard 10.4, 10.5 (establishing defense team, relationship with client); ABA Criminal Standard 4-2.1, 4-3.1, 4-4.1 (communication, relationship with counsel, and investigative duties). These alleged violations, he argues, constitute structural error.

**¶45**     Citing *Wiggins v. Smith*, 539 U.S. 510 (2003), Kiles argues that breach of these standards is qualitatively different from typical claims of ineffective assistance of counsel. But *Wiggins* announced no new category of structural error. Rather, that case addressed an ineffective assistance of counsel claim, an issue on which professional standards have considerable bearing. *See id*. at 519-20 ("Petitioner renews his contention that his attorneys' performance at sentencing violated his Sixth Amendment right to effective assistance of counsel."); *Strickland v. Washington*, 466 U.S. 668, 691-92 (1984) (noting professionally unreasonable standard).[13]     Nor do any of the

---

[13]     Although this Court has subscribed to the ABA Capital Standards under Arizona Rule of Criminal Procedure 6.8

allegations raised by Kiles obviate the need for a proper Rule 32 proceeding at which there will be a full opportunity to assess counsels' actions.

E

¶46  Kiles' case was subject to regular news coverage; Kiles claims the <u>Yuma Sun</u> published ninety-eight articles during a ten-year period. He maintains the articles detailed evidence of the case, including that the victims likely died from the same cause, that Kiles had told several people in Yuma he had committed the crimes, that Kiles had made inculpatory statements during sentencing at the original trial, and that he elected to stay silent in that trial. In addition, he argues, the coverage revealed personal information about witnesses, expert testimony from sentencing, and many other facts. Kiles argued that the trial court should have concluded that this publicity was excessive and inflammatory and that the court should have presumed prejudice and moved the second trial to another county.[14]

---

(b)(1)(iii), the comment to the rule itself makes clear "[a] deviation from the guidelines . . . is not per se ineffective assistance of counsel. The standard for evaluating counsel's performance continues to be that set forth in *Strickland* . . . ." Ariz. R. Crim. P. 6.8, 2006 cmt.

[14]  Kiles did not contend that he proved actual prejudice from the news coverage. *See State v. Davolt*, 207 Ariz. 191, 206, ¶ 50, 84 P.3d 456, 471 (2004) ("The critical inquiry is the

¶47    The trial court denied Kiles' motion.  The court noted the ten-year span and the fact that Yuma is a "growing community" with a "transient" population, which suggested that the most damaging stories simply would be unknown to most people.

¶48    Whether a change of venue must be ordered turns on whether "pretrial publicity will probably deprive the party of a fair trial," and the Court reviews the trial court's determination for an abuse of discretion.  *Cruz*, 218 Ariz. at 156, ¶ 12, 181 P.3d at 203 (alterations and internal quotation marks omitted).

¶49    Kiles argues that the pre-trial publicity in Yuma County was such that this Court should presume prejudice to his fair trial rights.  He has not established, however, that the media coverage created an "outrageous . . . 'carnival-like' atmosphere."  *Id.* at 157, ¶ 15, 181 P.3d at 204 (quoting *State v. Atwood*, 171 Ariz. 576, 631, 832 P.3d 593, 648 (1992)); *see also State v. Bible*, 175 Ariz. 549, 567, 858 P.2d 1152, 1170 (1993) ("Although many cases discuss the doctrine, very few cases have actually presumed prejudice due to a carnival or circus atmosphere at trial.").  At most, Kiles' brief and the arguments presented below point to regular press coverage over

---

'*effect* of publicity on a juror's objectivity'") (quoting *State v. LaGrand*, 153 Ariz. 21, 34, 734 P.2d 563, 576 (1987)).

22

the course of some ten years.  Kiles simply has not satisfied the "extremely heavy" burden of demonstrating that the pre-trial publicity was presumptively prejudicial.  *See Bible*, 175 Ariz. at 564, 858 P.2d at 1167.

¶50     Kiles also argues that *State v. Schmid*, 109 Ariz. 349, 509 P.2d 619 (1973), requires an automatic change of venue if certain facts are reported by the news media.  But that case, which offers suggestions to news organizations to avoid unfair proceedings, simply does not stand for the proposition that any mention of certain information will require reversal.  *Id*. at 353-54, 509 P.2d at 623-24 (suggesting "publicity" of sensitive information like guilt or innocence, existence and contents of confessions and admissions, identity and credibility of witnesses "may result in reversal").

## III

### A

¶51     Over defense objection, the trial court permitted the State to offer both Kiles' conviction for aggravated assault and his conviction for attempted aggravated assault to prove the (F)(2) aggravating factor.  *See* A.R.S. § 13-1204(A)(8) (Supp. 1985) (aggravated assault); A.R.S. §§ 13-1001(A) (2001) (attempt), 13-1204(A)(1) (2001) (aggravated assault).  When Kiles committed Valerie's murder, a defendant's prior conviction for "a felony in the United States involving the use or threat

23

of violence on another person" was an aggravating circumstance. A.R.S. § 13-703(F)(2) (1989).[15]  This Court affirmed the use of both convictions in *Kiles I*.  *See* 175 Ariz. at 370, 857 P.2d at 1224.

¶52     At the second trial, defense counsel correctly argued that *Kiles I* is inconsistent with subsequent case law defining the (F)(2) aggravator.  As this Court has clarified, "if [an] offense *could* have been committed without the use or threat of violence, the prior conviction does not qualify as an (F)(2) aggravator."  *State v. McCray*, 218 *Ariz.* 252, 257, ¶ 17, 183 P.3d 503, 508 (2008).  For example, because Arizona's attempt statute permits a crime to be committed with a single nonviolent step, an attempted murder did not qualify under (F)(2).  *State v. Williams*, 183 Ariz. 368, 382, 904 P.2d 437, 451 (1995). *Kiles I* is inconsistent with these decisions.  *See* 175 Ariz. at 370, 857 P.2d at 1224.

¶53     At oral argument, the State argued that *Kiles I* is the law of this case.  The law of the case is

> a rule of general application that the decision of an appellate court in a case is the law of that case on the points presented throughout all the subsequent proceedings in the case in both the trial and the appellate courts, and no question necessarily involved and decided on that appeal will be considered on a second appeal or writ of error in the same case,

---

[15]     The legislature later rewrote the statute to list the crimes that qualify for the (F)(2) aggravator.  *See* 1993 Ariz. Sess. Laws, ch. 153, § 1 (1st Reg. Sess.).

24

> provided the facts and issues are substantially the
> same as those on which the first decision rested, and,
> according to some authorities, provided the decision
> is on the merits.

*State v. Bocharski*, 218 Ariz. 476, 489, ¶ 60, 189 P.3d 403, 416 (2008) (quoting *State v. King*, 180 Ariz. 268, 278, 883 P.2d 1024, 1034 (1994)).    Kiles is correct that the use of the attempted offense is inconsistent with recent cases such as *McCray*.    But the Yuma County judge was not free to question this Court's ruling on a legal issue for the subsequent retrial. Nevertheless, the law of the case is a procedural rule, and this Court can recognize that a former ruling has been rendered obsolete by later case law.    *Cf. King*, 180 Ariz. at 278-79, 883 P.2d at 1034-35 (recognizing court's power to revisit prior rulings).    Under more recent cases, the attempted aggravated assault conviction does not establish the (F)(2) aggravator.

¶54      The (F)(2) aggravator remains valid, however, because of the other conviction.    *Williams*, 183 Ariz. at 382, 904 P.2d at 451 (noting that reliance on ineligible conviction is "immaterial" when another conviction suffices).    Because Kiles does not challenge the use of his aggravated assault conviction, any error here is harmless beyond a reasonable doubt.    *See State v. Sansing*, 206 Ariz. 232, 237, ¶ 16, 77 P.3d 30, 35 (2003) (holding error harmless when no reasonable jury could have

25

failed to find aggravating factor established).[16]

**B**

¶55     Kiles next contends that because two jurors were not convinced beyond a reasonable doubt that Kiles himself committed the murders of the children, the (F)(8) aggravator should have been stricken.  In essence, he argues that an inconsistency between the aggravation-phase jury's verdict and the guilt-phase jury's felony murder verdict renders the (F)(8) aggravator unconstitutional.

¶56     In 2000, the guilt-phase jury convicted Kiles of first degree murder of the two children.  In reaching their verdicts, two jurors concluded that the murder of one daughter was felony murder, and five jurors concluded that the murder of the other daughter was felony murder.  The remaining jurors concluded the murder of each child was premeditated.

¶57     Before the 2006 sentencing jury could consider the

---

[16]    We also reject Kiles' argument that *Brown v. Sanders*, 546 U.S. 212 (2006), requires remand for resentencing.  *Brown* held that in a state like Arizona, in which "the [capital] eligibility factors by definition identif[y] distinct and particular aggravating features, if one of them was invalid the jury could not consider the facts and circumstances relevant to that factor as aggravating in some other capacity." *Id*. at 217. Even if "the sentencer's consideration of an invalid eligibility factor . . . skewed its balancing of aggravators with mitigators," reversal is not required if "a state appellate court determine[s] the error was harmless or *reweigh*[s] *the mitigating evidence against the valid aggravating factors*." *Id*. (emphasis added).  Here, the factor itself remains properly established, and, in any event, because we independently review Kiles' sentence, *Brown* is inapposite.

26

aggravating factors, the trial court charged the jury with determining whether the convictions for first degree murder of the children qualified as death-eligible murders under *Tison v. Arizona*, 481 U.S. 137 (1987), and *Enmund v. Florida*, 458 U.S. 782 (1982).[17]

¶58    The verdict form specifically asked the jurors to reach conclusions on four separate *Enmund/Tison* issues: (1) whether Kiles killed each child, (2) whether Kiles attempted to kill each child, (3) whether Kiles intended that a killing take place, and (4) whether Kiles was a major participant in the crime of child abuse and acted with reckless indifference to human life.   Ten jurors found that Kiles killed both; eleven found that he attempted to kill both; and twelve jurors found that Kiles both intended a killing to take place and that he was a major participant in the crime of child abuse and acted with reckless indifference to human life.

¶59    After making its *Enmund/Tison* findings, the jurors

---

[17]    *Enmund* and *Tison* address the proportionality of capital punishment for felony murder under the Eighth Amendment. *See Tison,* 481 U.S. at 146-48 (explaining Eighth Amendment issues). In *Enmund*, the Supreme Court reversed a Florida Supreme Court decision because it "affirmed the death penalty . . . in the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken."   458 U.S. at 801.   In *Tison*, the Court concluded that a capital sentence could be appropriate when the defendant exhibits "reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death."   481 U.S. at 157-58.

were asked whether the State had proven the (F)(8) aggravator. The court instructed the jurors: "You must assess the aggravators based upon evidence of the defendant's own actions and mental state."  The judge then told the jury that

> to find the aggravating factor of the defendant being convicted of one or more other homicides, which were committed during the commission of this offense, you may not make your finding based solely upon the trial jury's verdict of guilt on multiple homicides. . . . [Y]ou must find that the other murders were related in time and space and motivation to the first degree murder, which you are considering.  This instruction applies to each of the three murders.
>
> A temporal or time relationship exists between multiple homicides when it is established beyond a reasonable doubt that the murders were committed within a short span of time.
>
> A spatial relationship exists when it is established beyond a reasonable doubt that the victims were killed in close physical proximity to each other.
>
> A motivational relationship exists when it is established beyond a reasonable doubt that the victims were killed for a related reason.

The jury unanimously found the (F)(8) aggravator was proven beyond a reasonable doubt.

¶60      Kiles' arguments with regard to the (F)(8) aggravator miss the mark.  First, as the State notes, there is no need for unanimity on a single theory.  *Cf. State v. Gomez*, 211 Ariz. 494, 498 n.3, ¶ 16, 123 P.3d 1131, 1135 n.3 (2005) ("A jury need not be unanimous as to the theory of first degree murder so long as all agree that the murder was committed.").  Second, Kiles'

28

argument confuses two separate issues. The first issue is the *Enmund/Tison* question: whether a felony murder may qualify to make a person eligible for *consideration* of a capital sentence. The second issue is whether the jury may consider convictions for the murders of the children in determining whether the (F)(8) aggravator was proven as to Valerie.

¶61    Under the (F)(8) aggravator, jurors are asked whether "the defendant [has been] convicted of one or more other homicides, which were committed during the commission of this offense," and whether such crimes are motivationally, temporally, and spatially related to the offense considered for a capital sentence. Determining whether the mixed premeditated-murder and felony murder verdicts for the children's deaths made those convictions death-eligible differs from deciding whether the convictions for those murders qualify under the (F)(8) aggravator for Valerie's death. Indeed, at oral argument, Kiles conceded that because he does not challenge his guilt for the slayings of the two children, he is guilty of those crimes. Consequently, we reject Kiles' effort to question the jury's findings on the (F)(8) aggravator.

## IV

¶62    Because the murders were committed before August 1, 2002, we review aggravation, mitigation, and the propriety of the sentence "independently" under A.R.S. § 13-755(A)-(C) (Supp.

29

2008).  2002 Ariz. Sess. Laws, ch. 1, § 7 (5th Spec. Sess.).  In conducting such review, we "consider the quality and the strength, not simply the number, of aggravating and mitigating factors."  *State v. Roque*, 213 Ariz. 193, 230, ¶ 166, 141 P.3d 368, 405 (2006) (quoting *State v. Greene*, 192 Ariz. 431, 443, ¶ 60, 967 P.2d 106, 118 (1998)).

## A

¶63    The jury found three aggravating circumstances:  that the defendant was previously convicted of a felony involving the use or threat of violence on another person, *see* A.R.S. § 13-703(F)(2) (1989), that the defendant committed the offense in an especially heinous, cruel, or depraved manner, *see id.* § 13-751(F)(6) (Supp. 2008), and that the defendant was convicted of one or more other homicides that were committed during the commission of the offense, *see id.* § 13-751(F)(8).  We review the record de novo to "determine[] [whether] an error was made regarding a finding of aggravation."  *Id.* § 13-755(B); *Anderson II*, 210 Ariz. at 354 & n.21, ¶ 119, 111 P.3d at 396 & n.21.

## 1

¶64    As previously discussed, it was error to permit the jury to use Kiles' attempted aggravated assault conviction to satisfy the (F)(2) aggravator.  Kiles' previous conviction for aggravated assault, however, proves the (F)(2) aggravator beyond a reasonable doubt.  *See* ¶¶ 51-54, *supra*.

30

¶65    "Cruelty involves the pain and distress" to the victim and may be found when "the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur." *Anderson II*, 210 Ariz. at 352 n.18, ¶ 109, 111 P.3d at 394 n.18 (internal quotation marks omitted).

¶66    The evidence shows beyond a reasonable doubt that the murder of Valerie was especially cruel. Kiles admitted that Valerie remained conscious after the attack began, and the medical testimony regarding defensive wounds supported that conclusion.

¶67    Additional evidence supports the (F)(6) aggravator and the version of events Kiles admitted to Hawkins. A pillow with blood on it consistent with a source that continued to move was found in Valerie's bedroom. A transfer stain consistent with a person running a bloody hand along a door was also identified. Blood spatter was found between eighteen and twenty-four inches from the ground, indicating that "the source of the blood would be lower toward the floor." The transfer stain on the door, together with spatter on the lower part of the north and south walls of the living room, indicated that either the blood source or the attacker was moving. A piece of the jack itself was found in the bedroom with Valerie's blood on it. This evidence

directly contradicts Kiles' trial testimony, when, contrary to his earlier admissions, he claimed that when he hit Valerie with the jack, she fell down in a living room chair and never got up.[18]

**¶68** The (F)(6) cruelty aggravator was proven as to mental and physical cruelty. *See State v. Boggs*, 218 Ariz. 325, 341, ¶ 78, 185 P.3d 111, 127 (2008) (affirming (F)(6) aggravator based on admissions by defendant corroborated by physical evidence).

**¶69** Kiles' argument that *State v. Soto-Fong*, 187 Ariz. 186, 928 P.2d 610 (1996), requires the Court to vacate the (F)(6) finding is incorrect. In *Soto-Fong*, we rejected the (F)(6) mental cruelty finding because the evidence indicated only that one of the defendants "thought" one of the victims lingered before dying. *Id*. at 204-05, 928 P.2d at 628-29. In this case the evidence shows that Valerie was conscious after the attack began and thus "experienced significant uncertainty as to her ultimate fate." *State v. Ellison*, 213 Ariz. 116, 142,

---

[18]     Kiles separately raises on appeal the denial of his motion for acquittal of the (F)(6) aggravator under Ariz. R. Crim. P. 20 (stating that "[i]n an aggravation hearing, . . . on a motion of a defendant . . . , the court shall enter a judgment that an aggravating circumstance was not proven if there is no substantial evidence to warrant the allegation"). Because this case is subject to our independent review, however, our analysis of sufficiency of the evidence supporting an aggravating factor subsumes any Rule 20 issue. *Anderson II*, 210 Ariz. at 354, ¶ 119 & n.21, 111 P.3d at 396 & n.21.

¶¶ 120-21, 140 P.3d 899, 925 (2006) (internal quotation marks omitted).  We distinguished *Soto-Fong* on similar terms in *Boggs.* 218 Ariz. at 341, ¶ 78, 185 P.3d at 127.

**3**

¶70    "To establish the [(F)(8)] aggravator, we evaluate the temporal, spatial, and motivational relationships between the capital homicide and the collateral homicide . . . ."  *Id*. at ¶ 79 (internal quotation marks and substitutions omitted).

¶71    Kiles was convicted of first degree murder of all three victims.  Kiles no longer disputes that he murdered the children, and his own testimony confirms that he bludgeoned Valerie to death.  Witnesses testified that Kiles admitted killing the children because they had seen the murder and because they were screaming.  Larry Hawkins testified that Kiles admitted that all three murders had been committed at the same time and that he disposed of the children's bodies.  Further, blood from both children was found in their bedroom in Valerie's apartment.  Given this evidence, "[t]he record demonstrates that all three murders occurred on the same day and in the same apartment . . . it is difficult to imagine a motive for the killings [of the children] unrelated to the murder of [Valerie]."  *State v. Tucker* (*Tucker II*), 215 Ariz. 298, 321, ¶ 105, 160 P.3d 177, 200 (2007) (internal quotation marks omitted).  Further, a continuing course of criminal conduct

33

establishes a motivational link. *See Boggs*, 218 Ariz. at 342, ¶ 81, 185 P.3d at 128. Accordingly, the (F)(8) aggravator was proven beyond a reasonable doubt.

**B**

**¶72** The jury considered a comprehensive mitigation presentation that sought to establish several mitigating facts, including good behavior while in custody; a family history of substance abuse; Kiles' substance abuse; good character; and various psychological and character disorders including post-traumatic stress disorder and attention deficit hyperactivity disorder. In urging this Court to conclude that he should receive a sentence of less than death, Kiles emphasizes psychological issues, chronic substance abuse, his good behavior in custody, and his "traumatic" childhood. He argues both statutory and non-statutory mitigation.

**1**

**¶73** Kiles makes two claims to establish that his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired." A.R.S. § 13-751(G)(1). He argues that psychological conditions and chronic intoxication establish this statutory mitigator.

**a**

**¶74** At the penalty phase, Kiles offered testimony of four mental health experts who suggested that a combination of

34

psychological and substance abuse issues impaired Kiles' judgment. This evidence, Kiles argues, establishes the statutory mitigating factor of diminished capacity. *See id.*

¶75 Psychiatrist Albert Globus testified, based on his review of records and an interview of Kiles, that at the time of the murders Kiles was addicted to and dependent on alcohol and cocaine, that he suffered from chronic depression stemming from childhood, and had experienced "psychotic decompensation," a "toxic psychosis as a result of too much drugs, such as cocaine, and even to some extent from alcohol." He also testified that Kiles had some impairment due to exposure in utero to alcohol, based on his mother's admitted drinking and pharmaceutical use while pregnant. Kiles' family history included evidence of violence and drug and alcohol abuse. His family history was consistent with making him genetically and environmentally predisposed to depression, which in turn may have led to his drug use, while at the same time preventing the development of proper coping mechanisms. Dr. Globus concluded that Kiles' use of cocaine caused him to act impulsively, without "careful consideration" of the consequences.

¶76 Dr. Thomas Gaughan, another psychiatrist, also testified. He interviewed Kiles for five hours and reviewed numerous school, police, medical, and other records. Dr. Gaughan diagnosed Kiles with post-traumatic stress disorder

brought on by violence and abuse. He found Kiles' strong reaction to being touched a symptom of that abuse. Although Kiles himself claimed his home life was loving, Dr. Gaughan testified that evidence suggested it was not. Based on Kiles' description of his childhood and school reports, Dr. Gaughan also diagnosed Kiles with attention deficit hyperactivity disorder, which includes impulsivity. He further opined that drug and alcohol use, combined with attention deficit hyperactivity disorder and post-traumatic stress disorder, "decreas[e] the ability to apply [the] sort of rational thought and judgment in terms of inhibiting actions."[19]

¶77 Dr. Ashley Hart also testified. He originally diagnosed Kiles with post-traumatic stress disorder based on the murders themselves. In addition, he stated that Kiles had a narcissistic personality disorder, bipolar disorder, and poly-substance dependencies. He further testified that, although the murders were the result of an "irresistible impulse," Kiles knew that his violence and substance abuse were related.

¶78 Finally, Dr. Mark Cunningham, a clinical psychologist, identified "factors [that] predisposed [Kiles] to criminal behavior." Cunningham's presentation was based on an interview with Kiles and an extensive review of records. His method was

---

[19] In addition, Dr. Gaughan diagnosed Kiles with obsessive compulsive disorder.

to take studies, particularly studies from the U.S. Department of Justice, and apply them to the facts of Kiles' life to establish his risk of criminal behavior.

¶79 In rebuttal, the State offered the testimony of Dr. John Scialli, who testified based on his review of numerous psychological and psychiatric reports, and a five-hour interview of Kiles. He stated that Kiles reported routinely carrying weapons, getting into fights, and feeling the need for retribution. Because Kiles' birth weight was normal, Dr. Scialli concluded that Kiles did not have fetal alcohol syndrome and that any effect from fetal exposure to alcohol would have been minimal. He also directly contradicted Dr. Gaughan's post-traumatic stress disorder diagnosis. He testified that, in any event, the disorder does not lead to the kind of impaired judgment Kiles' experts claimed. Dr. Scialli's principal diagnosis was that Kiles suffered from an anti-social personality disorder along with substance dependencies and intoxication.

¶80 John Moran, a psychologist, also testified for the State. He stated that the results of a personality test showed Kiles had traits consistent with an anti-social personality disorder.

¶81 The opinions offered by the experts indicate Kiles has a personality or character disorder. On balance, however, the

expert testimony does not show that Kiles established the statutory mitigating factor of diminished capacity. *See* A.R.S. § 13-751(G)(1); *Tucker II*, 215 Ariz. at 323, ¶ 118, 160 P.3d at 202 (rejecting similar evidence as proof of statutory mitigation). Rather, Kiles proved that he suffered from some form of personality disorder, which we consider as non-statutory mitigation. *See Tucker II*, 215 Ariz. at 323, ¶ 118, 160 P.3d at 202.

**b**

¶82    Kiles claims that his chronic drug abuse at the time of the offense established the statutory mitigator of voluntary intoxication. "Voluntary intoxication is a mitigating circumstance under § 13-[751](G)(1) if it significantly impairs a defendant's capacity to conform his conduct to requirements of the law." *Kiles I*, 175 Ariz. at 374, 857 P.2d at 1228 (citation omitted). But "[w]e have frequently found that a defendant's claim of alcohol or drug impairment fails when there is evidence that the defendant took steps to avoid prosecution shortly after the murder, or when it appears that intoxication did not overwhelm the defendant's ability to control his physical behavior." *State v. Reinhardt*, 190 Ariz. 579, 591-92, 951 P.2d 454, 466-67 (1997). Kiles admitted he attempted to clean up the scene of the crime and disposed of the bodies of the two girls. Accordingly, he has not proven the statutory mitigation of

38

impairment due to abuse of alcohol and drugs. *See* A.R.S § 13-751(G)(1). Nonetheless, because Kiles' abuse of intoxicants was not disputed by the State's experts, he has proved chronic intoxication as a non-statutory mitigating factor.

**2**

¶83 Kiles raises many non-statutory mitigating factors which, he claims, also demonstrate that he has established a capital sentence is inappropriate.

**a**

¶84 Kiles proved by a preponderance of the evidence good behavior in custody through evidence that he was entitled to special privileges in prison and evidence that he was a model prisoner in the Yuma County jail, where he treated staff with the "utmost respect" and had no disciplinary record in six years.

**b**

¶85 Kiles established that he had a less-than-ideal childhood. For example, Kathy Perrone, who lived with the Kiles family for about a year, recalled that Imojean Kiles was strict, drank heavily, and administered "spankings, whippings, [and] beatings." She also stated that Kiles' father's death in the early 1980s was hard on him. Imojean Kiles reported to Dr. Gaughan that Kiles' father threatened Kiles with a gun and once choked him. Kiles reported seeing his father and mother fight

39

violently.

¶86     The evidence presented is not entirely clear cut, however, because witnesses testified that Kiles' home-life was ordinary.  For example, Kathy Perrone agreed that the Kiles family had a "nice home," that he was a "mama's boy," and that she never saw either parent strike him.  Similarly, she testified Kiles was a well-liked child who did as he was told during his early adolescence.  Another witness, Yolanda Beibrich, testified that in high school Kiles was well-liked, respected his elders, and got along with his peers.  Although Kiles did not establish an extraordinarily bad home life, he did establish that his home life was not ideal.

c

¶87     As noted above, Kiles established that he suffered from some form of personality disorder and that he was substance dependent at the time of the murders.  Accordingly, we consider these factors as non-statutory mitigators.

C

¶88     The State proved three aggravating factors, including the multiple-murder aggravator, which "receives extraordinary weight."  *Boggs*, 218 Ariz. at 344, ¶ 93, 185 P.3d at 130 (internal quotation marks omitted).  Valerie's murder was especially cruel and inflicted both mental and physical pain on her as she remained conscious after the attack began.

40

**¶89** In light of this significant aggravation, Kiles' mitigation evidence is not particularly compelling. Although Kiles established that he has been a model prisoner since being taken into custody, this Court accords this mitigating factor minimal weight because of the expectation that prisoners behave in prison. *State v. Dann*, 220 Ariz. 351, ___, ¶ 141, 207 P.3d 604, 628 (2009).

**¶90** The psychiatric testimony, although consistent with a personality disorder, did not establish a sufficient connection to the murder to warrant significant weight; at most it established Kiles' bad judgment, not his inability to judge. *See Tucker II*, 215 Ariz. at 323, ¶ 118, 160 P.3d at 202; *State v. Pandeli*, 215 Ariz. 514, 533, ¶ 81, 161 P.3d 557, 576 (2007) (noting that insubstantial impairment and defendant's ability to discern right from wrong lead to according such mitigation lesser weight). Kiles argues that this Court should give great weight to the fact that he acted impulsively, suggesting this means he could not control his behavior. But this claim does not account for the sustained attack on Valerie, nor his decision to murder the children.

**¶91** Likewise, Kiles' non-statutory chronic intoxication claims warrant reduced weight given that his efforts to cover up the crime demonstrate his knowledge of its wrongfulness. *Reinhardt*, 190 Ariz. at 591-92, 951 P.2d at 466-67. In

41

addition, although Kiles established that he was a "good kid" who had a less-than-ideal childhood, this evidence carries minimal weight "because the evidence . . . is far removed from the crime." *State v. Armstrong*, 218 Ariz. 451, 465-66, ¶ 79, 189 P.3d 378, 392-93 (2008). Kiles was twenty-seven at the time of the murder.

¶92    Taken together, and in light of the significant weight accorded to the (F)(6) and (F)(8) aggravators, the mitigation offered by Kiles is not sufficient to call for leniency. In light of the facts and circumstances of Kiles and his crime, death is the appropriate sentence.[20]

**V**

¶93    For the forgoing reasons we affirm the verdict and sentence.

_____
Michael D. Ryan, Justice

_____

[20]    Kiles raises several issues previously decided by the Supreme Court, the Ninth Circuit Court of Appeals, or this Court to preserve for federal review. These, with one exception, are listed in the attached appendix, along with authority Kiles identifies as having rejected his arguments.

The exception is Kiles' argument that lethal injection as employed by the State is cruel and unusual. We reject that issue as premature because Kiles "may raise in a petition filed pursuant to Arizona Rule of Criminal Procedure 32 any objections to the protocol to be used." *State v. Andriano*, 215 Ariz. 497, 510 n.9, ¶ 62, 161 P.3d 540, 553 n.9 (2007).

CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
Andrew D. Hurwitz, Vice Chief Justice


_____
W. Scott Bales, Justice


_____
Ruth V. McGregor, Justice (Retired)

## Appendix

### Issues preserved for federal review

**1)** The death penalty is per se cruel and unusual punishment and violates the Eighth and Fourteenth Amendments, and Article 2, § 15 of the Arizona Constitution. *Rejected by Gregg v. Georgia*, 428 U.S. 153, 186-87 (1976); *State v. Harrod* (*Harrod I*), 200 Ariz. 309, 320, ¶ 59, 26 P.3d 492, 503 (2001); *State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992); *State v. Gillies*, 135 Ariz. 500, 507, 662 P.2d 1007, 1014 (1983).

**2)** The death statute unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstance exist. *Rejected by Walton v. Arizona*, 497 U.S. 639, 648 (1990); *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996*); State v. Bolton*, 182 Ariz. 290, 310, 896 P.2d 830, 850 (1995).

**3)** The death statute is unconstitutional because it fails to guide the sentencing jury with a limiting definition of who is eligible for the death penalty aggravating circumstances, narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty. The broad scope of Arizona's aggravating factors, the broad definition of premeditation, and the expansive number of offenses under Arizona's felony murder law make death-eligible

44

nearly anyone who is involved in a murder, in violation of the Eighth and Fourteenth Amendments and Article 2, § 15 of the Arizona Constitution. *Rejected by State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991).

**4)** Arizona's death statute unconstitutionally requires defendants to prove their lives should be spared. *Rejected by State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988).

**5)** Arizona's death penalty statute unconstitutionally fails to require either cumulative consideration of multiple mitigating factors or that the jury make specific findings as to each mitigating factor. *Rejected by State v. Gulbrandson*, 184 Ariz. 46, 69, 906 P.2d 579, 602 (1995); *State v. Ramirez*, 178 Ariz. 116, 131, 871 P.2d 237, 252 (1994); *State v. Fierro*, 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990).

**6)** Arizona's statutory scheme for considering mitigating evidence is unconstitutional because it limits full consideration of that evidence. *Rejected by State v. Mata*, 125 Ariz. 233, 242, 609 P.2d 48, 57 (1980).

**7)** The statute is unconstitutional because there are no statutory standards for weighing. *Rejected by State v. Atwood*, 171 Ariz. 576, 645-46 n.21, 832 P.2d 593, 662-63 n.21 (1992).

**8)** Arizona's death statute insufficiently channels the sentencer's discretion in imposing the death penalty. *Rejected*

*by Greenway*, 170 Ariz. at 164, 823 P.2d at 31.

**9)** Arizona's death statute is unconstitutionally defective because it fails to require the State to prove that death is appropriate. *Rejected by Gulbrandson*, 184 Ariz. at 72, 906 P.2d at 605.

**10)** The prosecutor's discretion to seek the death penalty unconstitutionally lacks standards, in violation of the Eighth and Fourteenth Amendments and Article 2, §§ 1, 4, and 15 of the Arizona Constitution. *Rejected by State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992).

**11)** The constitution requires a proportionality review of a defendant's death sentence which would allow the court to identify cases sufficiently above the norm of first degree murder to justify capital punishment. *Rejected by Salazar*, 173 Ariz. at 416, 844 P.2d at 588.

**12)** There is no meaningful distinction between capital and non-capital cases, making each crime the product of an unconstitutionally vague statute. *Rejected by Salazar*, 173 Ariz. at 411, 844 P.2d at 578.

**13)** Arizona's capital sentencing scheme unconstitutionally serves no deterrent purpose, exceeds any legitimate retributive aim, is without penalogical justification, and results in the gratuitous infliction of suffering. *Rejected by Gregg*, 428 U.S. at 183.

**14)** The conditions and length of appellant's confinement constitute cruel and unusual punishment. *Rejected by Comer v. Stewart*, 215 F.3d 910, 916 (9th Cir. 2000).