70 So.3d 289 (2011)
Richard SCRUSHY
v.
Wade C. TUCKER and the Wendell J. Cook, Sr., Testamentary Trust, John P. Cook, trustee, derivatively, for and on behalf of HealthSouth Corporation.
1081424.
Supreme Court of Alabama.
January 28, 2011.
Rehearing Denied April 15, 2011.
*293 Susan Walker of Waldrep Stewart & Kendick, Birmingham, for appellant.
John D. Haley, Ralph D. Cook, Bruce J. McKee, and Michael D. Ermert of Hare, Wynn, Newell & Newton, LLP, Birmingham; John Q. Somerville of Galloway & Somerville, Birmingham; Frank P. DiPrima, Morristown, New Jersey; Steven P. Gregory, Birmingham; and Ronald A. Brown of Prickett Jones & Elliott, P.A., Wilmington, Delaware, for the Tucker appellees.
David G. Hymer and Anne Marie Siebel of Bradley Arant Boult Cummings LLP, Birmingham, for appellee HealthSouth Corporation.
WOODALL, Justice.
In this shareholder-derivative action, Richard Scrushy, a former director and former chief executive officer ("CEO") of HealthSouth Corporation ("HealthSouth"), a Delaware corporation, appeals from a judgment against him for $2,876,103,000. This action was commenced on August 28, 2002, on behalf of nominal defendant HealthSouth by Wade C. Tucker, a shareholder of HealthSouth since August 18, 1998. We affirm.

I. Facts and Procedural Background
Certain aspects of this case have already come before us during this long and intricate litigation. See Scrushy v. Tucker, 955 So.2d 988 (Ala.2006) ("Scrushy," sometimes referred to herein as "the bonus case"); and Ernst & Young, LLP v. Tucker, 940 So.2d 269 (Ala.2006)("Tucker"). It was the first of a number of derivative actions to be commenced by various HealthSouth shareholders against Scrushy and other former HealthSouth officials and related parties in various forums including (1) the Jefferson Circuit Court, (2) the United States District Court for the Northern District of Alabama ("the Federal derivative actions"), and (3) the New Castle Chancery Court in Delaware, Biondi v. Scrushy, 820 A.2d 1148 (Del.Ch.2003), restyled and resolved, In re HealthSouth Shareholders Litig., 845 A.2d 1096 (Del. Ch.2003), aff'd, 847 A.2d 1121 (Del.2004) (table) ("the Delaware derivative actions").
The derivative actions appear to have been sparked by the "`public scrutiny of HealthSouth's financial integrity,'" which "`first became intense in the summer of 2002.'" Tucker, 940 So.2d at 273 (quoting Teachers' Retirement Sys. of Louisiana v. Scrushy, Civ. A. 20529, March 2, 2004 (Del.Ch.2004) (not published in A.2d)).
"`At that time, HealthSouth announced that a new policy regarding reimbursement issued by the federal Centers for *294 Medicare and Medicaid Services (the "CMS Policy") would have a large, detrimental effect on the company's revenues. Put simply, many stockholders. . . were deeply suspicious about HealthSouth's announcement, given that the CMS Policy had, according to them, been expected for some time. In particular, they suspected that HealthSouth insidersmany of whom had engaged in large transactions involving sales of HealthSouth stock earlier that year had concealed the effect of the CMS Policy in order to keep HealthSouth's stock price artificially high.'"
Id.
In March 2003, federal authorities learned that, beginning at least as early as 1994, HealthSouth corporate officers had engaged in a fraudulent accounting scheme of "massive" proportion. United States v. Martin, 455 F.3d 1227, 1230 (11th Cir. 2006). The fraud involved a conspiracy by HealthSouth officers
"to artificially inflate HealthSouth's reported earnings and earnings per share, and to falsify reports about HealthSouth's overall financial condition. The HealthSouth officers made, and directed accounting personnel to make, false and fraudulent entries in HealthSouth's books and records for the purpose of falsely reporting HealthSouth's assets, revenues, and earnings per share and in order to defraud investors, banks, and lenders. As a result, HealthSouth's public financial records overstated its financial position cumulatively by billions of dollars from 1994 to 2002, and public investors purchased overvalued shares of HealthSouth's stock, which plummeted. . . to $.11 per share when the massive fraud was revealed."
Id. Throughout the litigation of this case, the accounting scheme has been referred to as "the fraud," which practice will generally be followed throughout this opinion.
Criminal charges were filed against various alleged conspiratorial HealthSouth officers as early as April 2003 in the United States District Court for the Northern District of Alabama. Eventually, at least 15 "`senior HealthSouth executives . . . [pleaded] guilty to sundry and various criminal acts, including criminal fraud, specifically regarding the accuracy, reliability, falsification and fabrication of the financial information and documentation that HealthSouth was legally required to file during the years 1996 through 2002.'" Scrushy, 955 So.2d at 993 (quoting trial court's judgment).
Meanwhile, complaints in the pending derivative actions were amended to assert claims reflecting the latest revelations of fraud and mismanagement. In that connection, on August 8, 2003, Tucker filed a third amended complaint and a fourth amended complaint, asserting claims alleging, among other things, (1) improper "interested transactions," waste and "misappropriation of corporate assets"; (2) unjust enrichment; (3) breach of contract; (4) conspiracy; (5) "intentional, reckless, and innocent misrepresentation and suppression"; (6) breach of fiduciary duty of loyalty, related to fraud, false accounting, and "insider trading"; and (7) seeking to impose a constructive trust.
The pertinent allegations of the complaint included the following:
"36. Scrushy [and other defendants]. . . created false journal entries to HealthSouth's income statement and balance sheet accounts. . . .
"37. It was part of the wrongdoing and conspiracy that Scrushy [and other defendants] engaged in an unlawful scheme to inflate artificially HealthSouth's publicly reported earnings and earnings per share and to falsify reports *295 of HealthSouth's financial condition so that they could reward themselves with bonuses, stock options, and other corporate perks. Scrushy personally benefitted from the scheme to artificially inflate earnings, having sold at least 7,782,130 shares of stock since 1999 at prices grossly inflated by the materially misstated financial statements. Scrushy [and other defendants] `earned' tens of millions of dollars in bonuses, stock options, and excessive salary and perks based on the inflated earnings.
". . . .
"77. On or about July 31, 2002, Scrushy, with knowledge of material nonpublic information regarding HealthSouth's financial condition and prospects, sold back to HealthSouth 2,506,770 shares of HealthSouth stock at a price of $10.06 per share, or $25,218,106 (the `Buyback'). The Buyback was made at the direction of Scrushy, the Board of Directors and its Compensation Committee. . . .[1]
". . . .
"118. During each year from 1992 through his departure in March 2003, Scrushy received tens of millions of dollars in compensation from HealthSouth, including, but not limited to, salary, stock options, benefits, bonuses, incentive compensation, and other income from the corporation in the form of loans, benefits, and/or the use of equipment and facilities of HealthSouth.
"119. The amounts paid by HealthSouth to Scrushy were grossly excessive, particularly when one considers the value of stock and dividends.
"120. What is more, incentive compensation to Scrushy [and other defendants] in executive management, is based on HealthSouth's reported financial results. As those results are and were false, Scrushy [and other defendants] in executive management benefitted improperly and were unjustly enriched to the extent they received incentive compensation based on exaggerated revenues and profits.
". . . .
"140. At the very least, Scrushy knew that HealthSouth's financial health was materially overstated in its financial statements and public disclosures, whether because of material overstatements of revenues, profits, and assets, or because of past, present or future Medicare reimbursement problems, or both. Such material misstatements or omissions caused HealthSouth stock to be materially inflated at all times between 1999 and August 2002, and Scrushy knew it.
"141. [Scrushy sold] on May 14, 2002, . . . 5,275,360 shares of HealthSouth stock on the open market . . . at the grossly inflated price of $14.05 per share. Scrushy received $74,118,800 for his shares. On March 26, 2003, the first trading day after public disclosure of the massive false accounting, HealthSouth stock closed at $0.11 per share. This values the 5,275,360 shares Scrushy sold at $580,289.60.
"142. Based on the applicable state law doctrines of . . . Brophy [v. Cities Service Co., 70 A.2d 5 (Del.Ch.1949)], based on theories of breach of fiduciary duty, constructive trust, and unjust enrichment, Scrushy is liable to pay HealthSouth the proceeds of these illicit insider trades. . . .
". . . .

*296 "177. Payment of excessive salaries and benefits amounts to waste of corporate assets."
For all the alleged wrongful conduct, the complaint sought "money damages." Additionally, the complaint specifically requested "[d]isgorgement of amounts received as the result of breaches of fiduciary duty, waste of corporate assets, conflicted and prohibited transactions, misappropriation of corporate opportunities and assets, [and] unjust enrichment," as well as "[d]isgorgement of all compensation including but not limited to salary. . . as the result of the wrongful acts and breaches of fiduciary duty, breaches of contract, and breaches of duty of good faith." (Emphasis added.) It also sought "all such other relief at law and equity to which the corporation may be entitled."
Additionally, the third amended complaint averred that no pre-suit demand had been made "on the Board of Directors to take action to press the claims asserted [there]in because such a demand would have been futile." Approximately 10 pages of that complaint were devoted to an explication of the assertions of the futility of such a demand.
All HealthSouth derivative actions pending in the Jefferson Circuit Court were consolidated with Tucker's case no. CV-02-5212 or abated in its favor. Coordination orders were entered in the various derivative actions pending elsewhere:
"`In orders entered [in case no. CV-02-5212], [in the Federal derivative actions], and [in the Delaware derivative actions], the following division of labor was agreed upon by the then-existing derivative plaintiffs: 1) the Federal Derivative Actions would be stayed in favor of the Alabama Derivative Actions and the Delaware Derivative Actions; 2) the plaintiffs in the Delaware Derivative Actions would prosecute claims relating to Scrushy's sale of HealthSouth stock back to the company in summer 2000 (the so-called "Buyback") in [the Chancery Court of Delaware]; and 3) the remainder of the derivative claims would be prosecuted . . . in the Alabama Derivative Actions under the aegis of the Tucker Complaint. By [that] time, the counsel in the Delaware Derivative Actions were participating and conferring with counsel in the Alabama Derivative Actions and developing joint plans for prosecution of all the derivative claims.'"
Tucker, 940 So.2d at 275 (quoting Teachers' Retirement). Subsequently, the "Buyback" claims were decided in the plaintiffs' favor. In re HealthSouth Shareholders Litig., 845 A.2d 1096 (Del. Ch.2003), aff'd, 847 A.2d 1121 (Del.2004) (table).
In case no. CV-02-5212, the first claim to be presented for resolution was "Scrushy's alleged breach of duty in accepting bonuses that HealthSouth was not legally obligated to pay," Scrushy, 955 So.2d at 998, because HealthSouth's earnings, which had formed the bases for the bonuses, were "inflated," along with Tucker's request for disgorgement of those bonuses. That issue initially arose on December 15, 2003, when Tucker moved for a partial summary judgment, seeking a return of incentive bonuses HealthSouth had paid Scrushy from 1996 through 2002. On September 21, 2005, Scrushy filed a cross-motion, seeking a partial summary judgment "ordering that [he was] legally entitled to retain all bonus compensation received by him from HealthSouth, with the exception of annual bonuses received in 2001 and 2002, for which genuine issues of fact remain[ed]." In his brief in support of that motion, Scrushy also challenged Tucker's standing "to complain of alleged wrongdoing for the period prior to his *297 stock purchase [i.e., August 18, 1998]." (Emphasis added.)
On October 12, 2005, Tucker filed a document styled "joinder of plaintiff" in which he joined the Wendell J. Cook, Sr., Testamentary Trust, John P. Cook, trustee ("Cook"), as a derivative plaintiff pursuant to Rule 20(a), Ala. R. Civ. P. The document was verified by an affidavit stating that Cook had owned shares of HealthSouth stock continuously since 1993.
On January 3, 2006, the trial court denied Scrushy's motion in its entirety, but it granted, in part, Tucker's motion. With regard to the incentive bonuses paid to Scrushy in 1997 through 2002, the court held that "HealthSouth [had] incurred actual losses and no bonus pool existed out of which the bonuses for [those] years could properly have been paid" and, consequently, that "Scrushy [had been] unjustly enriched by [those] payments."[2] The court ordered Scrushy to return "$47,828,106, representing the bonuses paid for the years 1997-2002, plus prejudgment interest." Scrushy, 955 So.2d at 995. In so doing, the trial court rejected Scrushy's challenge to standing. In that connection, it stated, in part:
"Another shareholder, [Cook], which held its HealthSouth shares continuously since 1993, joined as plaintiff herein under [Ala. R. Civ. P.] Rule 20(a) on October 12, 2005, and adopted Tucker's complaint in its entirety. No party objected. [Cook] is represented by the identical legal team that represents Tucker. For all purposes [Cook's] shareholding relates back to the original Tucker complaint. In re Maxxam Inc./Federated Development, 698 A.2d 949 (Del.Ch.1996) (holding new shareholder plaintiff may be added even at a late stage to cure shareholding defect of earlier plaintiff). . . ."
The rest of the case proceeded to a trial without a jury, the parties having stipulated that resolution of the case turned on equitable claims to which the right to a trial by a jury did not apply and that the remedies were, likewise, equitable remedies. Indeed, resolution of the case was bolstered by a number of important stipulations. In particular, the parties stipulated that "[b]etween 1996 and March 18, 2003, certain executive, financial, and accounting managers at HealthSouth engaged in a conspiracy and fraud to overstate the financial health of HealthSouth in HealthSouth's financial statements." It was stipulated that "[t]he public financial reports issued for HealthSouth after July 1, 1996, and before March 18, 2003, were false and unreliable, and materially overstated HealthSouth's net income and the net assets on HealthSouth's balance sheet." The parties further stipulated that "the crucial issue in the case, overshadowing all others, is whether or not Scrushy knew of the fraud or intentionally disregarded his responsibilities to HealthSouth."
On June 18, 2009, the trial court entered a final judgment "in favor of Derivative Plaintiffs, Wade C. Tucker and the Wendell J. Cook, Sr., Testamentary Trust, John P. Cook, Trustee, for and on behalf of HealthSouth Corporation, and against Richard M. Scrushy," for $2,876,103,000. In connection with its findings of fact, the trial court stated its "firm and confident conclusion that Scrushy knew of and participated in the fraud from and after the summer of 1996" but that, in any event, "Scrushy [had] clearly breached his fiduciary *298 duty of loyalty by consciously disregarding his responsibilities to HealthSouth." (Emphasis added.)
For purposes of this appeal, three portions of the trial court's award are particularly pertinent. First, the court found that Scrushy had breached three of his employment contracts with HealthSouth, namely, (1) a 1986 employment agreement, (2) a 1998 employment agreement, and (3) a 2002 employment agreement, "by engaging in massive fraud and by consciously disregarding his responsibilities to HealthSouth." The trial court held those three employment contracts to be "rescinded on [that] ground," and it ordered the forfeiture of $26,725,000, plus prejudgment interest, which represented all compensation Scrushy had received for his services to HealthSouth under those contracts. Second, the court awarded $147,450,000, plus prejudgment interest, which represented "the total net profit Scrushy received from. . . two stock sales" Scrushy made on the basis of "inside information," in violation of principles set forth in Brophy v. Cities Service Co., 70 A.2d 5 (Del.Ch.1949). Third, the court awarded $206,383,000, plus prejudgment interest, based on Scrushy's participation in projects involving HealthSouth, namely, (1) sale and lease-back transactions with First Cambridge, "a real estate investment trust" started by "members of HealthSouth's management team"; and (2) the uncompleted construction of a facility known as the Digital Hospital, which was begun, but soon abandoned, by HealthSouth. The trial court certified its judgment as final, pursuant to Rule 54(b), Ala. R. Civ. P.
Scrushy argues for reversal of that judgment on a number of procedural and substantive grounds. More specifically, he says (1) that the trial court lacked subject-matter jurisdiction ab initio; (2) that the derivative claims are barred by the applicable statute of limitations and by the doctrine of res judicata; (3) that the basis for the forfeiture of Scrushy's employment compensation was not sufficiently pleaded; (4) that Brophy no longer provides a valid basis for an insider-trading claim; (5) that Cook was not properly joined as a plaintiff in the action; (6) that Scrushy's involvement in the First Cambridge and Digital Hospital projects was shielded by the business-judgment rule; and (7) that evidence regarding the damage sustained by HealthSouth in the First Cambridge and Digital Hospital projects was improperly admitted and considered.

II. Discussion
"`In Alabama, the law of the state of incorporation governs the internal corporate relationship.'" Ex parte Bentley, 50 So.3d 1063, 1070 (Ala.2010) (quoting In re Chalk Line Mfg., Inc., Bankr.No. 93-42773, Adv. No. 94-40003, July 26, 1994 (Bankr.N.D.Ala.1994) (not published in Bankruptcy Reporter)). This is known as the "internal-affairs doctrine." Id. "Under this doctrine, courts look to a corporation's state of incorporation as the source of substantive law governing claims regarding that corporation's internal affairs." In re Verisign, Inc., Derivative Litig., 531 F.Supp.2d 1173, 1214 (N.D.Cal.2007) (emphasis added). By contrast, "[a]s a general rule, the law of the forum [state] governs procedural matters." Chaplake Holdings, Ltd. v. Chrysler Corp., 766 A.2d 1, 5 (Del.2001) (emphasis added). However,
"[t]he procedural law of a foreign state will . . . be applied `when the law of a foreign state is applied to substantive issues [and] the procedural law of the foreign state is "so inseparably interwoven with substantive rights as to render a modification of the foregoing rule necessary, lest a party be thereby deprived of his legal rights."'"
*299 Id. (quoting Monsanto Co. v. Aetna Cas. & Sur. Co., Civ. A. 88C-JA-118, April 15, 1994 (Del.Super.1994) (not reported in A.2d), quoting in turn Connell v. Delaware Aircraft Indus., 55 A.2d 637, 640 (Del.Super.1947) (emphasis added)).
Matters are sometimes said to be procedural if they "`concern methods of presenting to a court the operative facts upon which legal relations depend'"; whereas substantive matters are "`those which concern the legal effect of those facts after they have been established.'" Schoenvogel v. Venator Group Retail, Inc., 895 So.2d 225, 251 (Ala.2004) (quoting G. Stumberg, Principles of Conflict of Laws 133 (3d ed.1963)). This case, therefore, requires the application of Alabama law to matters of procedure and Delaware law to matters of substance.
"Delaware maintains separate systems of courts in law and equity." Truck Components, Inc. v. Beatrice Co., 143 F.3d 1057, 1062 (7th Cir.1998); see also Monsanto Co. v. Aetna Cas. & Sur. Co., supra. Moreover, unpublished opinions of Delaware courts have precedential value. See Wisdom Import Sales Co. v. Labatt Brewing Co., 339 F.3d 101, 115 (2d Cir.2003) (unpublished opinion of the Delaware Chancery Court regarded as precedent); Reynolds v. Ellingsworth, 843 F.2d 712, 725 (3d Cir.1988) (unpublished opinions of the Delaware Supreme Court regarded as precedent).

A. Subject-Matter Jurisdiction
Procedurally, the complaint initiating this action was filed by Tucker pursuant to Rule 23.1, Ala. R. Civ. P., which provides:
"In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort."
(Emphasis added.)
The relevant portion of Rule 23.1, Del. Ch. Ct., similarly provides:
"In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall allege that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."
(Emphasis added.)
These rules embody a Delaware "pre-suit demand requirement," which is explained as follows:
"The decision whether to initiate or pursue a lawsuit on behalf of the corporation *300 is generally within the power and responsibility of the board of directors. This follows from the `cardinal precept of the General Corporation Law of the State of Delaware . . . that directors, rather than shareholders, manage the business and affairs of the corporation.' [Aronson v. Lewis, 473 A.2d 805, 811 (Del.1984)]. Accordingly, in order to cause the corporation to pursue litigation, a shareholder must either (1) make a pre-suit demand by presenting the allegations to the corporation's directors, requesting that they bring suit, and showing that they wrongfully refused to do so, or (2) plead facts showing that demand upon the board would have been futile. Where, as here, [the] plaintiff [did] not make a pre-suit demand on the board of directors, the complaint must plead with particularity facts showing that a demand on the board would have been futile. The purpose of the demand requirement is not to insulate defendants from liability; rather, the demand requirement and the strict requirements of factual particularity under Rule 23.1 `exist[] to preserve the primacy of board decisionmaking regarding legal claims belonging to the corporation.' [In re American Int'l Group, Inc., Consolidated Derivative Litig., 965 A.2d 763, 808 (Del.Ch.2009)]."
In re Citigroup Inc. Shareholder Derivative Litig., 964 A.2d 106, 120 (Del.Ch.2009) (emphasis added) (footnotes omitted).
Tucker made no pre-suit demand on HealthSouth's board of directors. Therefore, Scrushy moved to dismiss Tucker's original complaint on the ground that it failed to allege with the requisite particularity the reasons for Tucker's "failure to make any demand on the board or any effort to obtain action by the board." This motion was denied, and Tucker subsequently filed amended complaints. Although it is undisputed that the third amended complaint is not infirm for failure to plead demand excusal with the requisite specificity, Scrushy insists that the third amended complaint is a nullity. This is so, because, he says, the alleged insufficiency of the original complaint failed to evidence Tucker's standing under Delaware law, and, under Alabama law, he contends, standing is necessary at the commencement of the action to vest the trial court with subject-matter jurisdiction. According to Scrushy, because the original complaint insufficiently pleaded demand excusal, the trial court never acquired subject-matter jurisdiction of this action and every order entered in this case has been void ab initio.
For these propositions, Scrushy cites Cadle Co. v. Shabani, 4 So.3d 460, 463 (Ala.2008), in which this Court said:
"`When a party without standing purports to commence an action, the trial court acquires no subject-matter jurisdiction.' State v. Property at 2018 Rainbow Drive, 740 So.2d 1025, 1028 (Ala.1999). The jurisdictional defect resulting from the plaintiff's lack of standing cannot be cured by amending the complaint to add a party having standing."
To be sure, in Delaware, it is said that "[a] plaintiff's standing to sue in a derivative suit, whether based on demand-refused or demand-excused, must be determined on the basis of the well-pleaded allegations of the complaint." Scattered Corp. v. Chicago Stock Exch., Inc., 701 A.2d 70, 77 (Del.1997), overruled on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del.2000) (emphasis added). Generally, where no pre-suit demand has been made, an insufficiently pleaded derivative complaint will be dismissed. Zupnick v. Goizueta, 698 A.2d 384, 386 (Del.Ch.1997). Here, however, the dispositive questions *301 are (1) whether Delaware courts regard a derivative plaintiff's failure to plead demand excusal with the requisite specificity as a jurisdictional bar as Scrushy invites this Court to do, and, if not, (2) whether the Delaware approach is a matter of substance or must be applied in any event, because it is "`"so inseparably interwoven with substantive rights as to render a modification of the [general] rule necessary, lest a party be thereby deprived of his legal rights."'" Chaplake Holdings, 766 A.2d at 5 (quoting Monsanto Co. (not reported in A.2d), quoting in turn Connell, 55 A.2d at 640).
As to the first question, it is clear that Delaware courts do not regard a derivative plaintiff's failure to plead demand excusal with the requisite specificity as a jurisdictional bar. Cases can readily be found in which the Delaware courts have recognizedboth implicitly and explicitlythe right of a derivative plaintiff to amend a complaint to cure a deficiently pleaded demand-excusal requirement. In Kaufman v. Albin, 447 A.2d 761 (Del.Ch. 1982), for example, a shareholder of Philip A. Hunt Chemical Corporation ("Hunt") commenced a derivative action against certain officers of the corporation, alleging waste of corporate assets. Hunt moved to dismiss the complaint on the ground that it failed to "specifically plead any reasons for [the shareholder's] failure to make [a pre-suit] demand" on Hunt's directors. 447 A.2d at 764-65. The shareholder, "while sharply disputing Hunt's allegation that the complaint lack[ed] adequate specificity,... offered to amend the complaint in order to meet Hunt's arguments." 447 A.2d at 765. Then Vice Chancellor Hartnettthe future Justice Hartnettdenied Hunt's motion to dismiss, "conditioned upon the plaintiff's amendment of the complaint in order to more fully comply with Chancery Court Rule 23.1." Kaufman, 447 A.2d at 765 (emphasis added). Two years later, the shareholder having amended his complaint to re-plead the issue of demand excusal, the corporate defendants challenged the amended complaint in a renewed motion to dismiss or, in the alternative, for a summary judgment. Kaufman v. Belmont, 479 A.2d 282, 284 (Del.Ch.1984). That time, after a meticulous review of the allegations in the amended complaint, the vice chancellor granted the motion to dismiss. 479 A.2d at 289.
In re Walt Disney Co. Derivative Litigation, 731 A.2d 342 (Del.Ch.1998), rev'd in part, Brehm v. Eisner, 746 A.2d 244 (Del.2000), was an action seeking to hold, among other things, the directors of the corporation personally liable for breach of fiduciary duty and waste of corporate assets. The original complaint was amended, and the chancery court reviewed the first amended complaint in connection with the defendants' motion to dismiss for failure to comply with Rule 23.1. In re Walt Disney, 731 A.2d at 353. That court dismissed the action with prejudice, holding that the shareholders' first amended complaint failed "to allege particularized facts that excuse [a pre-suit] demand." Id. at 364. On appeal of that dismissal, the Delaware Supreme Court reversed the judgment in part, holding that, as to the claims of breach of fiduciary duty and waste of corporate assets, the action should be dismissed without prejudice to the shareholders' right to further amend their complaint in an attempt to satisfy the substantive standards of Rule 23.1. Brehm, 746 A.2d at 267.
Subsequently, the shareholders amended their complaint. On remand, however, the defendant directors moved to dismiss the second amended complaint, arguing that it also failed to plead sufficiently demand excusal. That time, the chancellor *302 disagreed and denied the motion to dismiss on the ground that the second amended complaint was "sufficiently plead[ed]." In re Walt Disney Co. Derivative Litig., 825 A.2d 275, 278 (Del.Ch.2003). See also Needham v. Cruver, Civ. A. 12428 & 12430, May 12, 1993 (Del.Ch.1993) (not reported in A.2d) (In response to a motion by directors/defendants to dismiss a derivative complaint for insufficient averment of demand excusal, the vice chancellor permitted the shareholder plaintiff to amend his complaint, then reviewed the amended complaint for the requisite particularity and held it to be sufficient.). It is clear from these and similar cases that the focus of the demand-excusal analysis in Delaware is not on the original complaintas would be necessary if, as Scrushy argues, an insufficiently pleaded original complaint fails to invoke the court's subject-matter jurisdictionbut, rather, on the complaint representing the shareholder's latest expression of demand excusal.
As to the second question, it is, at least in some instances, said that the question whether to accept an amended complaint is a substantive one. See Watwood v. Credit Bureau, Inc., 70 A.2d 62, 64 (D.C.App. 1949) ("[I]n the procedural confusion which attended the filing of the application for leave to amend, or at any rate the withdrawal thereof, it would seem that appellant lost, or is in danger of losing, a valuable substantive right: the right to amend her complaint."); see also Saint Paul Mercury Ins. Co. v. Circuit Court of Craighead County, 348 Ark. 197, 204, 73 S.W.3d 584, 588 (2002) ("The right to amend a complaint in circumstances such as we are dealing with is substantive, and not procedural, and the right to recover under the statute is dependent upon the complaining party bringing himself within the terms of the statute, as construed by this court.").
In this connection, the "demand requirements of Court of Chancery Rule 23.1.... are [not] mere formalities of litigation but strictures of substantive law." Tandycrafts, Inc. v. Initio Partners, 562 A.2d 1162, 1166 (Del.1989) (emphasis added). They constitute "a rule of substantive right designed to give a corporation the opportunity to rectify an alleged wrong without litigation, and to control any litigation which does arise." Aronson v. Lewis, 473 A.2d 805, 809 (Del.1984), overruled on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del.2000).
"[P]re-suit demand under Chancery Court Rule 23.1, is an objective burden which must be met in order for the shareholder to have capacity to sue on behalf of the corporation. The right to bring a derivative action does not come into existence until the plaintiff shareholder has made a demand on the corporation to institute such an action or until the shareholder has demonstrated that demand would be futile."
Kaplan v. Peat, Marwick, Mitchell & Co., 540 A.2d 726, 730 (Del.1988) (emphasis added).
Thus, in the absence of a pre-suit demand on the board, a complaint that pleads with particularity why demand should be excused is the sine qua non of a shareholder's right to proceed derivatively on behalf of the corporation. Compliance with the pleading requirement determines not only by whom a derivative action may be brought, but whether it may be brought at all. Whether to allow an amendment under such circumstances would seem to constitute a substantive question. However, we need not decide definitively whether that is so, because the right to amend is so inextricably intertwined with the substantive right to proceed derivatively in Delaware as to render it necessary to apply in this case the Delaware rule, be it substantive *303 or procedural. We hold, therefore, that Tucker's original complaint, notwithstanding its alleged lack of specificity as to demand excusal, did not fail to invoke the subject-matter jurisdiction of the trial court and that Tucker's third amended complaint is not a nullity.

B. Defenses of Statute of Limitations and Res Judicata
Scrushy contends that all the claims against him are barred by the three-year statute of limitations applicable in Delaware to claims of fraud and breach of fiduciary duty or, in the alternative, by the doctrine of res judicata. Regarding the statute-of-limitations defense, he insists that various public documents released by HealthSouth from 1996 to 1998 should have afforded HealthSouth's shareholders notice of certain transactions and conduct that form the basis of some of the claims in this action. Specifically, he states that forms filed publicly with the Securities and Exchange Commission disclosed "the compensation and bonuses paid to Scrushy as well as loans made to [him] with an interest rate less than prime rate." Scrushy's brief, at 52. Additionally, he insists, the forms revealed the existence of an earlier derivative action on behalf of HealthSouthcommenced in 1998alleging that certain officers and directors had "misrepresented or failed to disclose certain material facts concerning [HealthSouth's] business and financial condition." Scrushy's brief, at 53. According to Scrushy, this information should have placed Tucker on notice of any fraud and breach-of-fiduciary-duty claims he might have had no later than November 16, 1998, thus barring such claims asserted on August 28, 2002.
Scrushy alternatively insists that "Tucker's claims are barred by the doctrine of res judicata in that his claims and/or causes of action were brought, and some causes of action[, i.e., the `Buyback' claims,] were actually litigated to a final judgment, in [In re HealthSouth Shareholders Litig., 845 A.2d 1096 (Del.Ch. 2003), aff'd, 847 A.2d 1121 (Del.2004) (table)]." Scrushy's brief, at 59 (emphasis added).
Tucker and Cook contend that consideration of both these defenses is precluded by the doctrine of the law of the case. That is so, because, they say, Scrushy failed to assert them when this Court resolved the bonuses issue presented in Tucker, supra, where, in affirming the partial summary judgment against Scrushy for restitution of the amount paid to him in bonuses, "[w]e conclude[d] that, under the law of either Delaware or Alabama, Scrushy was unjustly enriched by the payment of the bonuses, which were the result of the vast accounting fraud perpetrated upon HealthSouth and its shareholders." 955 So.2d at 1012. Tucker and Cook contend that both defenses should have been asserted in that first appeal of this case.
According to Scrushy, the doctrine of the law of the case "turns on whether the Court addressed the issue between the parties" and does not apply because the defenses were not asserted in the first appeal. Reply brief, at 19-20. Scrushy's understanding of the law-of-the-case doctrine is inaccurate: it is not essential to the application of the doctrine that the issue be asserted in the first appeal. It is enough that the issue should have been raised in the first appeal. "Under the law of the case doctrine, `[a] party cannot on a second appeal relitigate issues which were resolved by the Court in the first appeal or which would have been resolved had they been properly presented in the first appeal.'" Kortum v. Johnson, 786 N.W.2d 702, 705 (N.D.2010)(quoting State ex rel. North Dakota Dep't of Labor v. Riemers, 779 N.W.2d 649 (N.D.2010) *304 (emphasis added)); see also Judy v. Martin, 381 S.C. 455, 458, 674 S.E.2d 151, 153 (2009) ("Under the law-of-the-case doctrine, a party is precluded from relitigating, after an appeal, matters that were either not raised on appeal, but should have been, or raised on appeal, but expressly rejected by the appellate court. C.J.S. Appeal & Error § 991 (2008)....").
The doctrine is the same in Alabama. "[I]n a second appeal, ... a matter that had occurred before the first appeal, but that was not raised in the first appeal, [is] the law of the case." Life Ins. Co. of Georgia v. Smith, 719 So.2d 797, 801 (Ala. 1998) (summarizing the holding in Sellers v. Dickert, 194 Ala. 661, 69 So. 604 (1915)).[3] The doctrine in this form was applied in Bankruptcy Authorities, Inc. v. State, 620 So.2d 626 (Ala.1993), which was the second of two appeals in that case. There, this Court held that the failure of the appellant to raise an issue in its first appeal regarding the sufficiency of the evidence to support the judgment precluded review of that issue in the second appeal.[4]
Procedurally, Scrushy had ample opportunity to assert the statute of limitations and the doctrine of res judicata as defenses to the partial summary judgment in the bonus case. The judgment in In re HealthSouth Shareholders Litigation, on which Scrushy relies for his res judicata defense, was affirmed by the Delaware Supreme Court on April 14, 2004. Scrushy did not file his cross-motion for a partial summary judgment in the bonus case until September 21, 2005, and the partial summary judgment was entered on January 3, 2006.
Indeed, on May 27, 2004, Scrushy actually raised in the trial court the statute-of-limitations defense in his motion to dismiss the third and fourth amended complaints. In particular, he argued that "any claim for unjust enrichment or innocent misrepresentation that seeks the return of [salary, bonuses, options and incentive compensation] paid to Mr. Scrushy more than two years prior to [August 28, 2002,] [was] barred by [the statute of limitations]." (Emphasis added.) However, he did not raise that defense again until after this Court had affirmed the partial summary judgment in the bonus case. Thus, because these defenses were not presented to this Court in the bonus case, we will not consider them here.

C. Compensation Forfeiture
Next, Scrushy challenges the basis on which the trial court ordered him to repay $26,725,000 "in damages relating to salaries and bonuses" that were "paid to [him] or on [his] behalf," pursuant to his three employment contracts with HealthSouth. Specifically, he contends that the court's award was based on the "equitable rescission" of his 1986, 1998, and 2002 employment contracts; that the amended complaint did not plead equitable rescission; and that Tucker and Cook have no "cause of action for equitable rescission." Scrushy's brief, at 85 (emphasis added). In ordering the $26,725,000 repayment, the court stated, in pertinent part:
"Having been determined to be a knowing and active participant in the fraud, and been found to have breached his duty of loyalty to HealthSouth, Scrushy has forfeited any rights under *305 the three employment contracts ... and Derivative Plaintiffs are entitled to rescind said contracts.
". . . .
"Scrushy fraudulently induced HealthSouth to enter into, or extend, or allow to be extended, any employment or employment-related contract between HealthSouth and Scrushy. Scrushy's employment contracts are rescinded on this ground, and Plaintiffs are entitled to recover on behalf of HealthSouth all sums paid to Scrushy or on Scrushy's behalf thereunder, all of which sums also constitute damages for his breach of the duty of loyalty."
(Emphasis added.)
Significantly, in challenging the basis of this portion of the judgment, Scrushy does not contest the sufficiency of the evidence in support of the claim alleging breach of fiduciary duty, which was a stated basis for the trial court's order of repayment. He does not dispute that an injury occurred, and he presents no issue as to the causation of injury and damage. Neither does he attempt to argue that breach of fiduciary duty provides no basis under Delaware law for the remedy effected here. Indeed, he entirely omits any reference to breach of fiduciary duty in his discussion of the repayment. Instead, he focuses exclusively on the remedy of "equitable rescission."
More specifically, he says:
"`Equitable rescission ... which is otherwise known as cancellation, is a form of remedy in which, in addition to a judicial declaration that a contract is invalid and a judicial award of money or property to restore plaintiff to his original condition is made, further equitable relief is required. Thus, the remedy of equitable rescission typically requires that the court cause an instrument, document, obligation or other matter affecting plaintiff's rights and/or liabilities to be set aside and annulled, thus restoring plaintiff to his original position and reestablishing title or recovering possession of property.'"
Scrushy's brief, at 86 (quoting E.I. Du Pont De Nemours & Co. v. HEM Research, Inc., Ms. Civ. A. 10747, October 13, 1989 (Del.Ch.1989) (not reported in A.2d) (emphasis omitted)).
According to Scrushy, the third and fourth amended complaints did not sufficiently plead the remedy of equitable rescission, because, he insists, they do not specifically mention equitable rescission or seek the cancellation or annulment of any instrument. The gravamen of Scrushy's argument is that the remedy of disgorgement derives solely from equitable rescission. However, it is evident that the trial court "also" ordered the repayment as "damages for [Scrushy's] breach of the duty of loyalty." In that connection, Tucker and Cook argue:
"The [judgment] hold[s] that Scrushy breached his fiduciary duty of loyalty. Under Delaware law, once a breach of the duty of loyalty is found, `significant discretion is given to the Court in fashioning an appropriate remedy.' Bomarko v. International Telecharge, Inc., 794 A.2d 1161, 1184 (Del.Ch.1999). The Court's `powers are complete to fashion any form of equitable and monetary relief as may be appropriate ...' Weinberger v. UOP, Inc., 457 A.2d 701, 714 (Del.1983). A finding of a breach of the duty of loyalty `permits broad, discretionary, and equitable remedies.' Gotham Partners, [L.P.] v. Hallwood Realty Partners, [L.P.], 817 A.2d 160, 175-76 (Del.2002)."
Tucker and Cook's brief, at 67-68 (footnote omitted) (emphasis added). They contend, in other words, that forfeiture of compensation in the sense of "damages for *306 [Scrushy's] breach of the duty of loyalty" wasas an alternative to the ground of equitable rescission on which Scrushy focusesa sufficient basis for the trial court's judgment.
At the risk of stating the obvious, Delaware law is that, in a variety of contexts and without regard to equitable rescission, a "breach of ... fiduciary duty renders [the wrongdoer] liable to disgorge any benefits emanating from, and providing compensation for any damages attributable to, that breach." Thorpe v. CERBCO, Inc., 676 A.2d 436, 437 (Del.1996). See Triton Constr. Co. v. Eastern Shore Elec. Servs., Inc., Civ. A. 3290-VCP, May 18, 2009 (Del.Ch.2009) (not reported in A.2d) (employee who breached a fiduciary duty to his employer by failing to inform it that he was simultaneously working for a competing company was liable to the employer to disgorge the compensation he received from the competing company); Julian v. Eastern States Constr. Serv., Inc., Civ. A. 1892-VCP, July 8, 2008 (Del. Ch.2008) (not reported in A.2d) (corporate directors who breached their duties of loyalty in voting themselves bonuses were required to "disgorge [their] bonuses and return the amounts they received with interest" to the corporation); Boyer v. Wilmington Materials, Inc., 754 A.2d 881, 908 (Del.Ch.1999) ("`acts of conscious wrongdoing and breaches of a fiduciary's duty of loyalty will best be deterred by requiring the wrongdoer to disgorge any profit made as a result of such wrongful conduct'").
Further, "numerous decisions hold that corporate compensation is properly recoverable in a situation where the disloyalty of the officer or director constitutes the usurpation of a corporate opportunity." Citron v. Merritt-Chapman & Scott Corp., 409 A.2d 607, 611 (Del.Ch.1977) (emphasis added), aff'd, 407 A.2d 1040 (Del.1979). See also Astra USA, Inc. v. Bildman, 455 Mass. 116, 128, 914 N.E.2d 36, 46 (2009) (applying New York law and holding that, under the faithless-fiduciary doctrine, remedies of rescission and "equitable forfeiture" are "duplicative" as to the disgorgement of the fiduciary's salary and bonuses).
The complaint, as amended, contains counts alleging, among other things, (1) fraud, (2) breach of fiduciary duty, (3) insider trading, (4) waste of corporate assets, and (5) usurpation of corporate opportunities. Under its "prayer for relief," the complaint expressly requested "[d]isgorgement of all compensation including but not limited to salary, stock options, benefits, bonuses, values of loans, and profits received by [Scrushy] as the result of the wrongful acts." (Emphasis added.) Thus, the amended complaint contains clearly pleaded allegations that at least arguably form supportable grounds for compensation forfeiture, as expressly referenced by the trial court in ordering the repayment of compensation.
Rather than address the forfeiture in the context of any of these grounds, Scrushy relies exclusively on his equitable-rescission argument. Under the following principles, he has waived a challenge to this aspect of the judgment:
"In order to secure a reversal, `the appellant has an affirmative duty of showing error upon the record.' Tucker v. Nichols, 431 So.2d 1263, 1264 (Ala. 1983). It is a familiar principle of law:
"`When an appellant confronts an issue below that the appellee contends warrants a judgment in its favor and the trial court's order does not specify a basis for its ruling, the omission of any argument on appeal as to that issue in the appellant's principal brief constitutes a waiver with respect to the issue.'

*307 "Fogarty v. Southworth, 953 So.2d 1225, 1232 (Ala.2006) (footnote omitted) (emphasis added). This waiver, namely, the failure of the appellant to discuss in the opening brief an issue on which the trial court might have relied as a basis for its judgment, results in an affirmance of that judgment. Id. That is so, because `this court will not presume such error on the part of the trial court.' Roberson v. C.P. Allen Constr. Co., 50 So.3d 471, 478 (Ala.Civ.App.2010) (emphasis added). See also Young v. Southern Life & Health Ins. Co., 495 So.2d 601 (Ala. 1986). If an appellant defaults on his or her duty to show error by failing to argue in an opening brief an unstated ground that was placed in issue below, then, a fortiori, a challenge to the judgment is waived where, as here, the trial court actually states two grounds for its judgment, both grounds are championed by the appellee, and the appellant simply declines to mention one of the two grounds."
Soutullo v. Mobile County, 58 So.3d 733, 738-39 (Ala.2010). Because Scrushy has pretermitted discussion of alternative grounds underpinning the trial court's holding forfeiting his compensation, we pretermit any further discussion of the equitable-rescission ground and affirm this aspect of the judgment.

D. Insider Trading
Where the fiduciary duty allegedly breached involves insider trading, Delaware provides a state-law cause of action under the principles set forth in Brophy v. Cities Service Co., 70 A.2d 5 (Del.Ch.1949). "[A] Brophy claim[] arises where `1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because [he or] she was motivated, in whole or in part, by the substance of that information.'" In re American Int'l Group, Inc., 965 A.2d 763, 800 (Del.Ch. 2009) (quoting In re Oracle Corp., 867 A.2d 904, 934 (Del.Ch.2004), aff'd, 872 A.2d 960 (Del.2005) (footnote omitted)). "The purpose of a Brophy claim is to remedy harm to the corporation.... The Brophy claim thus belongs to the corporation, although it can be asserted derivatively by a stockholder." Pfeiffer v. Toll, 989 A.2d 683, 699 (Del.Ch.2010).
The trial court's award under Brophy was based on stipulated facts evidencing two transactions (excluding the Buyback) in which Scrushy sold a total of 9,275,360 shares of HealthSouth stock for a profit of $147,450,000. Having found that the transactions were made "with guilty insider knowledge of the Fraud that vastly overstated Net Income, cash, and other assets," it ordered the disgorgement of that profit, plus $126,321,000 in prejudgment interest.
Scrushy does not challenge the sufficiency of the evidence of those findings or the computation of the award. In other words, Scrushy does not contend that the elements of a Brophy claim were not satisfied. Instead, he challenges the continuing validity of Brophy. More specifically, he contends that liability under Brophy is either (1) duplicative of that under the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, or (2) in conflict with, and thereby preempted by, the federal statutory scheme.
Even if we were writing on a clean slate, we would be reluctant to disturb Brophy a 61-year-old pillar of Delaware securities law. We need not belabor the issue, however, because the same arguments have recently been expressly rejected in Delaware. In Pfeiffer, supra, Vice Chancellor Laster rejected the arguments after a *308 painstaking historical analysis focusing on the relationship between the common law underlying Brophy and its progeny, on the one hand, and the federal scheme, on the other.
The vice chancellor observed that "federal law does not establish a `comprehensive federal regime regulating insider trading,'" but is, in fact, largely "a product of common law adjudication built by interpreting Section 10(b) of the Securities Exchange Act of 1934 (the `Exchange Act') and Rule 10b-5, the principal regulation implementing Section 10(b)." 989 A.2d at 701 (footnotes omitted).[5] "Federal law does not give rise to or establish the fiduciary duties of directors or officers." 989 A.2d at 704. Instead, a claim under federal law "depends on the existence of a fiduciary relationship or similar relationship of trust and confidence," which relationships are "governed by state law." Id. Consequently, he reasoned, "[i]f Delaware were to hold that the fiduciary duties of directors and officers did not limit their insider trading, the cornerstone of the federal system would be removed." Id. (emphasis added).
Similarly, in demonstrating that "the jurisdictional provisions of the Exchange Act do not preempt state law remedies," he stated:
"Section 28(a) of the Exchange Act provides: `[T]he rights and remedies provided by [the Exchange Act] shall be in addition to any and all other rights and remedies that may exist at law or in equity....' 15 U.S.C. § 78bb. Section 28(a) establishes that `the express intention of Congress was that the federal securities law would not dilute any remedies allowed by the states, either in law or equity.' Rossdeutscher v. Viacom, Inc., 768 A.2d 8, 17 (Del.2001). The federal remedies available under the Exchange Act were thus `intended to coexist with claims based on state law and not preempt them.' Id.

"Since the original adoption of the Exchange Act, Congress has twice addressed insider trading without altering the current regime. In 1984, Congress increased the penalties for insider trading. Insider Trading Sanctions Act of 1984, Pub.L. No. 98-376, 98 Stat. 1264 (codified at 15 U.S.C. § 78t). In 1988, Congress increased the penalties again. Insider Trading and Securities Fraud Enforcement Act of 1988, Pub.L. No. 100-704, 102 Stat. 4677 (codified at 15 U.S.C. § 78u-1). Congress also added § 20A to the Exchange Act, creating an explicit private cause of action against any person who violates insider trading rules that can be brought by anyone who traded contemporaneously with the violator. Id. § 78t-1. Neither statute sought to preempt or eliminate a state law derivative remedy.
"In 1995, Congress adopted the Private Securities Litigation Reform Act of 1995 (the `PSLRA'). Pub.L. No. 104-67, 109 Stat. 737 (codified at 15 U.S.C. § 78u-4). In 1998, Congress enacted the Securities Litigation Uniform Standards Act of 1998 (`SLUSA'). Pub.L. No. 105-353, 112 Stat. 3227 (codified at 15 U.S.C. § 77z-1). SLUSA amended the Exchange Act to prevent plaintiffs from avoiding the PSLRA by filing class actions in state court and to require generally that all class actions involving the purchase or sale of securities traded on a national exchange be brought exclusively in federal court under federal law. SLUSA preserved and did not preempt *309 an `exclusively derivative action brought by one or more shareholders on behalf of a corporation.' 15 U.S.C. § 78bb(f)(5)(c). SLUSA also preserved and did not preempt state law class actions based on the fiduciary duty of disclosure owed by corporate directors to stockholders. 15 U.S.C. § 78bb(f)(3)(A)."
Pfeiffer, 989 A.2d at 703.
The vice chancellor concluded, moreover, that "the standards applied under Brophy do not conflict with the federal securities laws." 989 A.2d at 707-08. Causes of action under both federal law and Brophy require "`proof that the selling defendants acted with scienter.'" 989 A.2d at 708 (quoting Guttman v. Huang, 823 A.2d 492, 505 (Del.Ch.2003)). Indeed, he explained, "[t]he elements of a Brophy claim ... `more or less track the key requirements to recover against an insider under federal law.'" 989 A.2d at 708 (quoting In re Oracle Corp., 867 A.2d 904, 934 (Del.Ch.2004), aff'd, 872 A.2d 960 (Del. 2005)).
Scrushy does not attempt to refute the reasoning of Pfeiffer. His response is merely to denigrate that opinion on the ground that it represents the "judgment of [a] trial court." Reply brief, at 31. However, it bears repeating that opinions of the Delaware Chancery Courts, unlike those of trial courts of other states, are regarded as precedent. Wisdom Import Sales Co. v. Labatt Brewing Co., 339 F.3d at 115. It must also be remembered that Brophy itself was a chancery court opinion. Yet Brophy has been a part of the warp and woof of Delaware securities law for more than 60 years. It has often been cited with approval by the Delaware Supreme Court. See Oberly v. Kirby, 592 A.2d 445, 463 (Del.1991); Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261, 1283 (Del.1989); Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del.1983); Citron v. Merritt-Chapman & Scott Corp., 407 A.2d 1040, 1043 (Del.1979); Singer v. Magnavox Co., 380 A.2d 969, 977 (Del.1977), overruled on other grounds, Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del.1983); and Adams v. Jankouskas, 452 A.2d 148, 152 (Del.1982). It has also been cited with approval by the United States Supreme Court. See Chiarella v. United States, 445 U.S. 222, 228 n. 10, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980).
The judgment in this case was cited with approval in Pfeiffer, 989 A.2d at 700. In light of the thorough and thoughtful discussion in Pfeiffer, and the absence of persuasive counter authority,[6] we conclude that Brophy neither is an anachronism nor is preempted by federal securities law. We decline, therefore, Scrushy's invitation to hold that Brophy is no longer good law.

E. Propriety of Cook's Joinder
Scrushy challenges Cook's joinder in the action on the basis of the document filed on October 12, 2005, styled "joinder of plaintiff." More specifically, he contends:
"[B]ecause Tucker failed to name and join [Cook] in his original complaint, he was required to either: (1) file a motion to amend his complaint pursuant to Rule 15[, Ala. R. Civ. P.], or (2) pursuant to Rule 21, [Ala. R. Civ. P.,] to file a motion to add [Cook] as plaintiff and obtain an order granting the addition. Tucker took neither action and, therefore, [Cook] was not properly added as an additional plaintiff in Tucker's derivative action.... Consequently, the trial *310 court erred in holding that Tucker had the authority to bring and prosecute claims against Scrushy for events that happened before August 18, 1998. Scrushy was prejudiced by this error and the judgment of the trial court is due to be reversed."
Scrushy's brief, at 83-84 (emphasis added).
To be sure, Tucker did not "file a motion to add [Cook] as plaintiff and obtain an order granting the addition." However, in its January 3, 2006, order entering a partial summary judgment, which ordered Scrushy to return "$47,828,106, representing the bonuses paid for the years 1997-2002," the trial court stated: "Another shareholder, [Cook], which held its HealthSouth shares continuously since 1993, joined as plaintiff herein under [Ala. R. Civ.P.] Rule 20(a) on October 12, 2005, and adopted Tucker's complaint in its entirety." (Emphasis added.) Thus, even before the appeal of the bonus case, the trial court sanctioned the proffered joinder and rejected Scrushy's challenge to Tucker's standing "to complain of alleged wrongdoing for the period prior to his stock purchase," i.e., prior to August 18, 1998.
It is well settled:
"Rule 21, Ala. R. Civ. P., provides, in pertinent part, that `[p]arties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just,' and this Court has held that the trial court is given `broad discretion' when determining whether to add or drop a party. Wood v. City of Huntsville, 384 So.2d 1081, 1083 (Ala.1980). See also State Highway Department v. Morgan, 584 So.2d 499, 502 (Ala.1991)."
Wiggins v. State Farm Fire & Cas. Co., 686 So.2d 218, 220 (Ala.1996). Indeed, Scrushy concedes that "the trial court could join [Cook] on its own motion," provided it had subject-matter jurisdiction. Reply brief, at 25. Because that is essentially what the trial court did in recognizing Cook's presence as a plaintiff, and because we have already held in Part II.A. of this opinion that the trial court had subject-matter jurisdiction at all stages of this action, we find no merit in Scrushy's challenge to Cook's joinder.

F. Business-Judgment Rule
Scrushy also contends that liability was imposed upon him for certain transactions in violation of the "business-judgment rule." These transactions involved First Cambridge, "a real estate investment trust," and the aborted construction of the Digital Hospital. Regarding First Cambridge, the trial court stated:
"Tucker [and Cook] contend[] that Scrushy, while HealthSouth's CEO, approved and appeared on both sides of several transactions between HealthSouth, on the one hand, and Scrushy or his family or trusts on the other. Plaintiffs contend that Scrushy caused HealthSouth ... to divert assets to First Cambridge, an entity in which Scrushy's daughter was to receive an equity interest and an entity utilized to perpetuate the Fraud....
"....
"First Cambridge was a real estate investment trust primarily started with HealthSouth's real estate.... Scrushy dictated the ownership percentages, but... HealthSouth was not to receive any ownership at all. A real estate investment trust called HCI entered into an agreement with HealthSouth in December 2001 to purchase and lease back land and improvements constituting 13 HealthSouth facilities for a purchase price of $81.5 million, whereupon HCI assigned all rights and duties to First Cambridge, which leased the properties *311 back to HealthSouth. HealthSouth did not receive full benefit of the purchase price for the properties, as it guaranteed an $82.5 loan from UBS [Securities, LLC (`UBS'),] to First Cambridge to finance the sale; the loan was payable December 26, 2002. In the ensuing year, HealthSouth paid First Cambridge $9.5 million in lease payments.
"Scrushy took a 20% ownership position in First Cambridge in his daughter's name. Under Scrushy's leadership as CEO, HealthSouth did not make public disclosure of the loan guarantee until after revelation of the Fraud; [former HealthSouth General Counsel, William W. Horton,] testified that he now regards the guarantee as having been material, which it obviously was.
"The loan defaulted, and HealthSouth had to make good on its guarantee on which Scrushy (or his daughter) was not at risk. In late 2002, it became obvious that First Cambridge could not repay the $82.5 million loan, leaving HealthSouth exposed on the guarantee. HealthSouth arranged for an extension in the loan due date of four business days, so that it came due on January 2, 2003, and paid UBS $1 million to grant that extension. With First Cambridge failing to meet its obligations, the sale-leaseback transaction was unwound, with the properties being re-conveyed to HealthSouth at an additional loss of $8.8 million.
"The First Cambridge transactions were plainly unfair to HealthSouth."
(Emphasis added; footnotes omitted.) The trial court awarded $15,500,000 in damages arising out of the First Cambridge transaction, plus prejudgment interest.
Regarding the Digital Hospital transaction, the trial court found:
"In 2001, HealthSouth began construction of a $400 million hospital facility on Highway 280, next to the corporate headquarters, called the `Digital Hospital.' HealthSouth paid $191 million in construction and maintenance on the Digital Hospital before construction ceased. HealthSouth sold the partially-built facility in 2008 for $1.5 million plus a 40% contingency interest, on which it has not received any payment. This court credits [the testimony of Jay Grinney, CEO of HealthSouth at the time of trial,] that the project could not be justified on any economic basis even if HealthSouth had the cash to complete it. Scrushy concedes that the decision to build it made no sense for a company that did not have the cash to complete it, that one would have to be a `complete bumbling idiot' to do so. As Scrushy knew that the cash was not there to complete the project, he is liable for all of HealthSouth's damages concerning the Digital Hospital.
"....
"... Amounts spent on the Digital Hospital facility were directly and proximately caused by the Fraud."
(Footnotes omitted; emphasis added.) The trial court awarded $190,883,000 in damages arising out of the Digital Hospital transaction, plus prejudgment interest. These findings were based on stipulated facts as well as on evidence presented ore tenus.
"It is well established that `[w]hen a trial court hears ore tenus testimony "its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust."'" Black Diamond Dev., Inc. v. Thompson, 979 So.2d 47, 52 (Ala.2007) (quoting New Props., L.L.C. v. Stewart, 905 So.2d 797, 799 (Ala.2004), *312 quoting in turn Philpot v. State, 843 So.2d 122, 125 (Ala.2002)). Scrushy does not challenge the sufficiency of these findings. Instead, he makes the conclusory statement that "he did not violate his duty of loyalty or good faith" and, therefore, that "the trial court erred by holding that Tucker [and Cook] rebutted the business judgment rule and by awarding [them] damages for interested transactions losses." Scrushy's brief, at 103 (emphasis added).
"The business judgment rule protects a board of directors from being questioned or second-guessed on conduct of corporate affairs. In re PSE & G S'holder Litig., 173 N.J. 258, 801 A.2d 295, 306 (2002). The business judgment rule is a rebuttable presumption that `in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.' Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984); In re PSE & G, 801 A.2d at 306. The business judgment rule is comprised of four elements: (1) a business decision; (2) disinterestedness and independence; (3) due care; and (4) good faith. Roselink Investors, L.L.C. v. Shenkman, 386 F.Supp.2d 209, 217-21 (S.D.N.Y.2004) (applying Delaware law). The presumption of the business judgment rule can be rebutted by demonstrating that one of these elements is not present. Id.; In re PSE & G, 801 A.2d at 306. If a party successfully rebuts the presumption, the burden of proof shifts to the defendant to show the entire fairness of the transaction. In re PSE & G, 801 A.2d at 306-07; Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261, 1280 (Del.1989)."
ASARCO LLC v. Americas Mining Corp., 396 B.R. 278, 405 (S.D.Tex.2008) (applying Delaware law) (emphasis added).[7]
In this connection, the trial court made the following unchallenged findings:
"Between July or August 1996 and his departure from the Board in 2005, Scrushy breached his fiduciary duty of loyalty to HealthSouth by knowing of, failing to report, or participating in and failing to report the Fraud.... The breaches of fiduciary duty arise out of each of the following: his participation in the Fraud in the accounting statements at HealthSouth, his conscious disregard of his duties as CEO, his participation in the self-dealing transactions that benefitted Scrushy to the detriment of HealthSouth...."
(Emphasis added.)
Although "a failure to act in good faith is not conduct that results, ipso facto, in the direct imposition of fiduciary liability," Stone ex rel. AmSouth Bancorp. v. Ritter, 911 A.2d 362, 369 (Del.2006), it follows that a judicial finding that a fiduciary has breached his duty of loyalty in the manner set forth by the trial court in this case suffices to show the absence of good faith. Id. at 370 ("Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith." (footnote omitted)). "Under Delaware law, a fiduciary may not choose to *313 manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity." Metro Commc'n Corp., BVI v. Advanced Mobilecomm Techs. Inc., 854 A.2d 121, 131 (Del.Ch.2004). Thus, fraud may also form the basis of a breach-of-fiduciary claim. Xu Hong Bin v. Heckmann Corp., Civ. A. 4637-CC, Oct. 26, 2009 (Del.Ch.2009) (not reported in A.2d).
Unchallenged findings made in this case demonstrate that the elements of the business-judgment rulespecifically, but not exclusively, the element of good faith were not satisfied. According to the trial court, the transactions involving First Cambridge and the Digital Hospital were linked to, or tainted by, the fraud. Contrary, therefore, to Scrushy's position, the business-judgment rule does not apply to these transactions. Moreover, the trial court found that the transactions were unfair to HealthSouth. For these reasons, Scrushy has not met his burden of showing that the trial court erred in awarding damages arising out of the First Cambridge and Digital Hospital transactions.

G. Admission of Evidence
Finally, Scrushy contends that "the trial court erred in allowing Tucker [and Cook] to present evidence of damages regarding First Cambridge and ... the Digital Hospital." Scrushy's brief, at 99.[8] According to Scrushy, the awards were erroneous, because, he says, the third and fourth amended complaints did not mention First Cambridge or the Digital Hospital.
In response, Tucker and Cook rely on Ala. R. Civ. P. 15(b), which states, in pertinent part:
"(b) Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits."
They contend that "the [t]hird and [f]ourth amended [c]omplaint[s] gave fair notice that [they] claim[ed] all damages resulting from the [f]raud. Both the First Cambridge transaction and the expenditure on the Digital Hospital were part of the fraud and represented damages from the [f]raud." Tucker and Cook's brief, at 82. Moreover, they argue, Scrushy was apprised of these claimed items of damage by their filing on April 3, 2009, a "Derivative Plaintiffs' Succinct Statement of Claims," specifically referencing First Cambridge and the Digital Hospital. Scrushy did not move in limine to exclude evidence of the transactions, nor did he object at trial when documentary, as well as ore tenus, evidence was, in fact, introduced.
Tucker and Cook also correctly observe that much of the evidence as to these transactions was included in the parties' joint stipulations. It was stipulated, for example, that the "[t]otal net cash paid out *314 as a result of the First Cambridge transaction aggregates $15,500,000." That was the precise amount awarded by the trial court for that transaction. In other stipulations, the parties stated that "HealthSouth paid $192,000,000 to partially build and maintain" the Digital Hospital[9] and that it was sold in its uncompleted state for $1,500,000.
Finally, Tucker and Cook point out that evidence of the challenged transactions was presented at trial by both sides. Indeed, both sides included remarks regarding First Cambridge in their opening statements. Later, on direct examination, Scrushy's counsel questioned Scrushy regarding his interest in First Cambridge and regarding the Digital Hospital. For these reasons, Tucker and Cook contend, matters regarding First Cambridge and the Digital Hospital were tried by consent and the pleadings are deemed to conform to the evidence. We agree.
"`Rule 15(b) is not permissive: it provides that issues tried by express or implied consent shall be treated as if raised in the pleadings.'" Ammons v. Tesker Mfg. Corp., 853 So.2d 210, 216 (Ala.2002) (quoting Hawk v. Bavarian Motor Works, 342 So.2d 355, 358 (Ala.1977) (emphasis added in Ammons)). See also Rule 54(c), Ala. R. Civ. P. ("[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings.").
"It is well settled law in Alabama that implied consent of the parties can be found when an opposing party fails to object to the introduction of evidence raising the disputed issue initially." Hosea O. Weaver & Sons, Inc. v. Towner, 663 So.2d 892, 896 (Ala.1995). "If a party objects to the introduction of evidence at the trial on the ground that it is not within the issues framed by the pleadings, he must show that he would be actually prejudiced in maintaining his action or defense on the merits by the admission of the evidence." Hawk, 342 So.2d at 358 (emphasis added).
"`[W]hether pleadings are deemed to be amended in order to conform to the evidence presented is also a matter within the discretion of the trial court,' and a decision in that regard will not be disturbed on appeal absent an abuse of discretion." International Rehab. Assocs., Inc. v. Adams, 613 So.2d 1207, 1214 (Ala. 1992) (quoting McCollum v. Reeves, 521 So.2d 13, 16-17 (Ala.1987)). "Failure to so amend `does not affect the result of the trial of these issues.' Therefore, any such `variance' cannot affect the result of this appeal." Whitfield v. Burttram, 471 So.2d 401, 405 (Ala.1985) (quoting Rule 15(b)).
Much of the evidence on which the trial court based its award was entered by stipulation. Other evidence relating to First Cambridge and the Digital Hospital was presented at the trial by Scrushy himself or without his objection. In no event did Scrushy ever argue that he "would be actually prejudiced in maintaining his ... defense on the merits by the admission of the evidence." Hawk, 342 So.2d at 358. Consequently, Scrushy has not demonstrated that the trial court exceeded its discretion in considering evidence relating to First Cambridge or the Digital Hospital.

III. Conclusion
For the reasons discussed above, Scrushy has demonstrated no error in any aspect of the trial court's judgment. That judgment is, therefore, affirmed.
AFFIRMED.
*315 COBB, C.J., and STUART, BOLIN, PARKER, and SHAW, JJ., concur.
MURDOCK, J., concurs in the result and concurs in the rationale in part.
MURDOCK, Justice (concurring in the result and concurring in the rationale in part).
I concur in the result in the main opinion and in the analysis by which it reaches that result, with the exception of the analysis in Parts II.B. and II.C., which I decline to join. As to Part II.C., see the discussion of Fogarty v. Southworth, 953 So.2d 1225 (Ala.2006), in my special writing and Justice See's special writing concurring specially in Pavilion Development, L.L.C. v. JBJ Partnership, 979 So.2d 24, 37, and 41 (Ala.2007).
NOTES
[1] Claims similar to this "Buyback" claim were also asserted in the first filed of the Delaware derivative actions.
[2] "With regard to the bonuses paid to Scrushy in 1996, the trial court held that because HealthSouth earned positive net income in 1996 issues of material fact precluded a summary judgment as to the 1996 bonuses." Scrushy, 955 So.2d at 994.
[3] The law-of-the case doctrine is procedural. Halliburton Energy Servs., Inc. v. NL Indus., 553 F.Supp.2d 733, 778 (S.D.Tex.2008); State v. Kiles, 222 Ariz. 25, 36, 213 P.3d 174, 185 (2009).
[4] Although the Court referred to the appellant's failure to raise the issue as a "waiver," it is just as properly referred to as a basis for the application of the law-of-the-case doctrine.
[5] The remedies supplied by federal law are not co-extensive with those under Brophy. See Diamond v. Oreamuno, 24 N.Y.2d 494, 500-01, 301 N.Y.S.2d 78, 248 N.E.2d 910, 913-14 (1969) (discussing Brophy).
[6] Contrary to the suggestion of Scrushy, Brophy was not within the purview of the Delaware Supreme Court in Malone v. Brincat, 722 A.2d 5 (Del. 1998), which case, therefore, sheds no light on this discussion.
[7] "The Supreme Court of Delaware has described the business-judgment rule as part-procedural and part-substantive." Davis v. Dorsey, 495 F.Supp.2d 1162, 1176 (M.D.Ala. 2007) (citing Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 360 (Del. 1993)). "Substantively, the rule prohibits courts from second-guessing the good-faith business judgments of corporate management.... Procedurally, the rule creates a burden-shifting mechanism...." Id.
[8] Scrushy does not challenge the manner in which the damages were calculated.
[9] We note that the figure used in the trial court's order was $191,000,000.